**Wendy TRUSKY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 98–298.

Supreme Court of Wyoming.

May 26, 2000.*

* This case was originally assigned to Justice Thomas on April 26, 1999, for the rendering of a proffered majority opinion. The case was reassigned to Justice Macy on December 16, 1999. Justice Macy distributed a proffered opinion to the Court on March 27, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Monique McBride, Assistant Appellate Counsel.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Barbara L. Boyer, Senior Assistant Attorney General.

Before LEHMAN, C.J.; THOMAS, MACY, and HILL, JJ.; and JOHN D. TROUGHTON**, D.J.

MACY, Justice.

The primary issue presented in this case is whether the trial court erred when it ordered the defense to produce a licensed clinical social worker's notes for the prosecution. Appellant Wendy Trusky (Wendy) hired the social worker to perform a psycho-social evaluation for use in her defense. The social worker was expected to testify as an expert, if necessary, during Wendy's homicide trial. Wendy claims the notes were encompassed within the attorney-client privilege. The introduction of evidence of Wendy's consensual sexual conduct with a male friend after the death of her husband and improper information before the trial court at the time of sentencing are additional issues we must resolve.

We affirm.

## ISSUES

Wendy presents the following issues for our review:

ISSUE I

Did the trial court commit reversible error by requiring the defense to provide to the prosecution notes generated by a

** Judge Troughton concurred in the result of part A and concurred in parts B, C & D.

defense social worker in preparation for trial?

ISSUE II

Did the trial court err in permitting the prosecutor to introduce evidence of Wendy's consensual sexual conduct with a male friend which occurred after Martin Trusky's death?

ISSUE III

Did the trial court rely on improper premises when it sentenced Wendy?

## FACTS

Wendy married Martin Trusky on October 16, 1976. The couple had four children, and, in 1993, the family moved from Pennsylvania to Wyoming where they purchased sixty-eight acres of land north of Glenrock. Wendy was a licensed practical nurse and began working at a nursing home in Casper. Because Martin was unable to read, he helped out with odd jobs, doing mostly mechanical work, but Wendy provided the family's main source of income.

Prior to their marriage and continuing throughout it, the couple had a history of domestic violence. Wendy testified that, on several occasions, she ended up in the hospital as a result of that violence. When she would return home late from work and shopping, Martin would throw the sacks of groceries or purchases on the ground to demonstrate his anger. He would stay in a rage for hours, break household items, and punch anyone he thought had crossed him, which included Wendy and their children. He also mentally abused Wendy and their children by killing the family pets, going so far as cooking their pet goat for dinner and informing them, after they had finished eating, that they had just eaten the goat. On one occasion, one of the children called the sheriff to stop Martin from beating Wendy. This did not stop the cycle of abuse. At times, to temper these fits of rage, Wendy put over-the-counter sleeping aids into her husband's dinner so that he would leave her and the children alone.

After leaving work on the afternoon of December 13, 1996, Wendy stopped at the grocery store and was late returning home.

Martin threw the bags of groceries on the ground, and the couple "scuffled.". Martin punched Wendy in the lip and grabbed her throat. On December 15, 1996, Wendy took one of the children to work with her, and, after she finished working, they stopped at Wal–Mart on the way out of town, arriving home in Glenrock about five o'clock in the afternoon. Wendy and Martin had another scuffle, and Martin struck Wendy. Wendy proceeded to make dinner, putting a sleeping aid in Martin's food. While Martin was in the bathroom, Wendy asked one of the children to bring her one bullet. She loaded the rifle and placed it beside the couch. After dinner, the family watched movies. The children went to bed when the movies were over, and Martin and Wendy discussed their failed marriage and his plans to return to Pennsylvania.

Wendy shot Martin sometime during the morning of December 16, 1996, after the children had gone to school. Wendy and the prosecution presented differing versions of how the shooting took place. According to Wendy, she shot Martin during an altercation. The prosecution maintained that she shot him while he was sleeping. Regardless of this discrepancy, the parties do not dispute that Wendy shot a bullet straight into the back of Martin's head. Thereafter, Wendy wrapped the body in a quilt, dragged it outside, and buried it under a pile of tires and car parts.

Wendy began to manufacture different stories regarding Martin's whereabouts. She told the children he had returned to Pennsylvania but told Martin's niece he had run off with another woman. Wendy told a law enforcement officer who was investigating a missing person's report for Martin that she did not know where he was but she suspected he had broken into her apartment. She even filed a police report regarding the alleged break-in. There were other versions regarding his absence that circulated, which included that she had taken Martin to the bus station so he could return to Pennsylvania and that he was working on a ranch.

After receiving no contact from or information about Martin, his family hired a private investigator. Law enforcement officers en-

tered the Glenrock property with a search warrant to search the premises for any sign of Martin. They ultimately found his body wrapped in a quilt and buried under a pile of tires behind the house.

On October 1, 1997, the county attorney filed an information charging Wendy with first-degree murder of Martin. Wendy was arrested on October 4, 1997. She pleaded not guilty, using battered woman syndrome as an element of her self-defense claim.[1] The jury returned a guilty verdict on the lesser-included offense of second-degree murder. The trial court sentenced Wendy to a prison term of not less than twenty-five years nor more than forty years. Wendy received credit for the 321 days she served in jail prior to sentencing. The notice of appeal was timely filed.

## DISCUSSION

### A. Social Worker's Notes

■ Wendy claims that the trial court improperly invaded the attorney-client privilege and violated her constitutional right to counsel when it required her to produce notes for the prosecution that had been taken by a licensed clinical social worker during a psycho-social evaluation of her. She also maintains that the trial court improperly expanded the discovery rules set out in W.R.Cr.P. 16(b)(1)(B) and W.R.Cr.P. 26.2(a) when it required her to give the notes to the prosecution. We are not persuaded by Wendy's arguments.

The defense hired the social worker to perform a psycho-social evaluation of Wendy. The prosecution filed a motion to compel discovery in March of 1998. Included in the motion was a request for "test questionnaires, notes of interviews, notes and reports of statements made, and other materials made or generated by [the social worker] or Psychotherapy Services" during Wendy's examination or evaluation for battered woman syndrome. Pursuant to W.R.Cr.P. 26.2, the prosecutor also requested "all notes and records to be referred to by any psychological, psychiatric, or other such person[s] who par-

ticipated in the examination process of Wendy Trusky."

Wendy claims that the social worker was acting as an agent for the defense and the social worker's communications with her were, therefore, protected by the attorney-client privilege. She also maintains that the Wyoming Rules of Evidence and Rules of Professional Conduct for Attorneys at Law mandate that individuals retained by counsel must keep information, which the client discloses to them, confidential. Wendy claims that, by requiring the social worker to disclose the notes of their discussions, the trial court intruded so substantially into the province of the attorney-client privilege that it violated both the Sixth Amendment to the United States Constitution and Article 1, Sections 6 and 10 of the Wyoming Constitution.

■ The essence of the sixth amendment right to effective assistance of counsel is, indeed, privacy of communication with counsel. *Glasser v. United States,* 315 U.S. 60, 62, 62 S.Ct. 457, 461, 86 L.Ed. 680 (1942). However,

> mere government intrusion into the attorney-client relationship, although not condoned by the court, is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant. Prejudice can manifest itself in several ways. It results when evidence gained through the interference is used against the defendant at trial. It also can result from the prosecution's use of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial.

*United States v. Irwin,* 612 F.2d 1182, 1186–87 (9th Cir.1980).

We have not previously addressed whether the attorney-client privilege protects conversations between a defendant and a mental health professional hired by the defense

---

1. In *Witt v. State,* 892 P.2d 132 (Wyo.1995), we recognized that battered woman syndrome was not a separate defense but was an element of self-defense.

when a defendant places her mental capacity at issue. We, therefore, turn to other jurisdictions for guidance on this issue. The Washington Supreme Court summarized the holdings of courts from several jurisdictions in *State v. Pawlyk*, 115 Wash.2d 457, 800 P.2d 338, 342 (1990) (en banc). Some courts hold that, when a defendant asserts an insanity defense, the privilege applies. 800 P.2d at 342. Others hold that the privilege is waived or does not apply. *Id.* We believe the cases which allow production of the information for the prosecution are better reasoned.

In *State v. Hamlet*, 133 Wash.2d 314, 944 P.2d 1026, 1030 (1997) (en banc), the Washington Supreme Court opined that, in cases involving claims of diminished capacity or insanity, the defense's evidence concerning the defendant's mental state may be more accurate than the prosecution's evidence. The court ruled, therefore, that, by asserting a defense of diminished capacity or insanity, the defendant waived the attorney-client privilege as to evidence concerning his mental state and the defense was obligated to disclose the evidence to the prosecution. 944 P.2d at 1030.

In *Gray v. District Court of Eleventh Judicial District*, 884 P.2d 286 (Colo.1994) (en banc), *cert denied*, 514 U.S. 1084, 115 S.Ct. 1797, 131 L.Ed.2d 725 (1995), the Colorado Supreme Court considered a Colorado statute pertaining to discovery and ruled that, when the defendant tenders a plea of not guilty by reason of insanity or asserts the affirmative defense of impaired mental condition, the attorney-client privilege is waived between the defendant and agents, including psychiatrists or psychologists, of the attorney. In *People v. Ullery*, 964 P.2d 539, 541 (Colo.Ct.App.1997), *aff'd in part & rev'd in part*, 984 P.2d 586 (Colo.1999) (en banc), a Colorado court of appeals held that a defendant who asserts the defense of impaired mental condition must produce all communications for the prosecution which occurred between the defendant and any mental health professional employed on his behalf. 964 P.2d at 541–42. The court specifically excluded disclosure of the defense attorney's work product, including his legal research, theories, opinions, or conclusions. 964 P.2d

at 542. The state appealed to the Colorado Supreme Court, contesting the court of appeals' decision that the attorney's work product was not subject to disclosure under the applicable statute. *People v. Ullery*, 984 P.2d 586, 589 (Colo.1999) (en banc). That court determined that the privilege applicable to the attorney's work product was not waived and information which truly fell within the category of attorney work product was not subject to disclosure to the prosecution. *Id.*

In *Clifford v. United States*, 532 A.2d 628, 636 (D.C.App.1987), a District of Columbia court of appeals stated: "[U]nless the defendant has waived the fifth amendment right against self-incrimination and the sixth amendment right to counsel, the government cannot attempt to prove guilt or determine punishment with expert testimony based on statements of the accused made during a compelled psychiatric examination." The privileges against self-incrimination and right to counsel, however, apply to only interrogation by government agents. 532 A.2d at 636. The court of appeals ruled, therefore, that, when the defendant voluntarily undergoes a mental examination, the trial court may order the defendant to provide the information gathered during the examination to the government without violating the defendant's Fifth or Sixth Amendment rights. *Id.*

Wendy may not argue a deficient mental condition and, at the same time, claim protection by privilege. She voluntarily hired the licensed social worker to evaluate her. The trial court's order requiring production of the social worker's notes did not intrude on Wendy's attorney-client privilege, and her constitutional right to assistance of counsel was not violated. Wendy argues that she was prejudiced by the prosecution's receipt of the social worker's notes because the prosecution used the information to prepare more thoroughly for its cross-examination of her. She overlooks the fact that, when she asserted an affirmative defense on the basis of diminished capacity and battered woman syndrome, the need for accurate evidence on her mental state became especially critical.

The social worker was one of the first people to examine Wendy. The social work-

er's results may be considered more reliable than Wendy's own statements as to her mental state. Basic fairness and integrity demand that we allow the prosecution access to any reports bearing on Wendy's mental state in order to avoid giving her an unfair advantage. *See Pawlyk,* 800 P.2d at 347–48.

### B. W.R.Cr.P. 16(b)(1)(B) and W.R.Cr.P. 26.2(a)

 Wendy contends that W.R.Cr.P. 16(b)(1)(B) and W.R.Cr.P. 26.2(a) did not mandate disclosure of the social worker's notes and interviews. The trial court has broad discretion in controlling discovery. *Nowotny v. L & B Contract Industries, Inc.,* 933 P.2d 452, 461 (Wyo.1997). In *Vaughn v. State,* 962 P.2d 149, 151 (Wyo.1998) (quoting *Martin v. State,* 720 P.2d 894, 897 (Wyo. 1986)), we said: " 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' "

W.R.Cr.P. 16(b)(1)(B) states:

(B) *Reports of examinations and tests.*—If the defendant demands disclosure under subdivision (a)(1)(C) or (a)(1)(D), upon compliance with such demand by the state, the defendant, on demand of the state, shall permit the state to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness's testimony.

W.R.Cr.P. 26.2(a) states:

(a) *Order for production.*—Upon order of the court, the attorney for the state or the defendant and the defendant's attorney shall produce for the examination and use of the other party, any written or recorded statement of a witness other than the defendant in their possession or which they

may reasonably obtain and which relates to the subject matter about which the witness has testified or will testify and:

(1) Upon demand of the other party, the court shall order the statement to be produced after a witness has testified; and

(2) Upon motion of a party or upon its own motion, the court may require the statement to be produced at any time before trial.

Wendy concedes that, once the social worker was designated as an expert, her results or reports were discoverable under W.R.Cr.P. 16(b)(1)(B) and W.R.Cr.P. 26.2(a). She argues, however, that the prosecution's right to discovery did not extend to the social worker's notes from interviews or conversations with her. The state maintains that the trial judge properly gave it access to the social worker's notes, especially in light of Wendy's failure to produce a report of any substance.

 We do not need to address whether the notes fall under the rubric of W.R.Cr.P. 16(b)(1)(B) and W.R.Cr.P. 26.2(a) because the record does not include a copy of the report or the notes. Without copies of the report or the notes in question, we are unable to determine whether the trial court abused its discretion in Wendy's case. The appellant has the burden to prove abuse of discretion and the burden to provide an adequate record on appeal. *Clark v. Alexander,* 953 P.2d 145, 150 (Wyo.1998); *Stadtfeld v. Stadtfeld,* 920 P.2d 662, 664 (Wyo.1996). Given Wendy's failure to provide us with a copy of the social worker's notes or the report, we have no choice but to affirm the trial court's decision to allow discovery of the notes pursuant to the relevant rules of criminal procedure.

### C. Impeachment Testimony

 The next issue we must address is whether the trial court abused its discretion in admitting Wendy's boyfriend's testimony concerning their sexual relationship. Decisions regarding the admission or exclusion of evidence are within the sound discretion of the trial court, and we give considerable deference to those determinations. *Sturgis v. State,* 932 P.2d 199, 201 (Wyo.1997). As long

as there is a "consistent and legitimate basis for the trial court's ruling," we will not find an abuse of discretion. *Id.*

■ Wendy claims that the trial court erred when it allowed the prosecution to introduce evidence of her sexual relationship with a man whom she met several months after her husband's death. During direct examination, Wendy testified that her husband sexually abused her and frequently forced her to do things against her will such as watching pornographic movies and replicating acts seen in those movies, performing oral and anal sex, and engaging in sexual behavior with him and another man. According to Wendy's expert, such sexual abuse is one of the factors involved in battered woman syndrome. Her expert testified: "Sex pressure rape, for those of you who aren't aware of the term, when you have sex with someone probably willingly then they force you to do things during the sexual act you are ashamed of. You feel guilty or makes you feel dirty or against your morals or value system."

The prosecutor cross-examined Wendy about her testimony that she would not have engaged in these sexual acts if her husband had not forced her to do so. Wendy objected to the line of questioning, but the trial court allowed it. Given the nature of Wendy's direct examination, the trial court allowed the prosecutor some latitude, limiting the nature of questions to those related specifically to Wendy's direct testimony.

The prosecutor also questioned Wendy's boyfriend about their sexual relationship. In contrast to Wendy's testimony, he testified that she willingly and, at her own instigation, performed oral sex on him; that the two of them had briefly watched a pornographic movie together; and that Wendy owned that movie.

■ Wendy maintains that the evidence of her sexual relationship with her new boyfriend was irrelevant and, therefore, inadmissible because it did not prove or disprove an element of the crime charged. W.R.E. 402. The trial court concluded that evidence contradicting Wendy's testimony that she abhorred these sexual practices and activities was relevant and, therefore, admissible. We agree. The evidence was relevant to the issue of Wendy's veracity. When a defendant "takes the witness stand in [her] own defense, [her] credibility becomes an issue and [she] may be cross-examined" regarding that testimony. *Montez v. State*, 670 P.2d 694, 696 (Wyo.1983).

■ Wendy further claims that the prosecutor used the evidence to convey to the jury that, by voluntarily engaging in such conduct with someone else, Wendy lied about her husband's sexual abuse of her. She contends, therefore, that the prosecution used the evidence to show that she could not have been afraid of her husband. She equates this evidence with other bad acts evidence and maintains it was inadmissible under W.R.E. 404(b). This evidence clearly does not fall within the rubric of W.R.E. 404(b). The prosecution used the evidence of Wendy's sexual activity with her boyfriend to demonstrate she lied about her distaste for such sexual activities, thus questioning her credibility and veracity.

> [A] defendant who has voluntarily testified may be cross-examined the same as any other witness and the latitude of cross-examination is largely within the discretion of the court. . . .
>
> . . . [T]he prosecution may impeach a witness' credibility by presenting competent evidence of an attempt to fabricate evidence.

*Roby v. State*, 587 P.2d 641, 644 (Wyo.1978). The trial court did not abuse its discretion in allowing the prosecutor to introduce this evidence.

■ Wendy also claims that the "rape shield" statute, Wyo. Stat. Ann. § 6–2–312 (LEXIS 1999), prohibited admitting evidence of her sexual conduct. The rape shield statute applies to "prosecution[s] under W.S. 6–2–302 through 6–2–305 [6–2–304] or for any lesser included offense, if evidence of the prior sexual conduct of the victim, reputation evidence or opinion evidence as to the character of the victim is to be offered." Section 6–2–312(a). In *Heinrich v. State*, 638 P.2d 641 (Wyo.1981), we addressed the purpose of rape shield statutes. They "were designed

to protect the *victim* from embarrassment and abuse at trial and also to encourage the reporting of sexual assaults to the authorities. They are not enacted for the protection of the accused." 638 P.2d at 646. The rape shield statute is inapplicable to Wendy's situation because first-degree murder is not one of the crimes enumerated in § 6–2–312(a) and she was the perpetrator, rather than the victim, of the offense at issue.

## D. Sentencing

 Wendy maintains that the trial court erred when it sentenced her. The state argues that the trial court's sentencing decisions were appropriate and any errors were harmless. We agree with the state.

 Sentencing decisions are normally within the discretion of the trial court. *Hamill v. State*, 948 P.2d 1356, 1358 (Wyo. 1997). "A sentence will not be disturbed because of sentencing procedures unless the defendant can show an abuse of discretion, procedural conduct prejudicial to him, and circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Smith v. State*, 941 P.2d 749, 750 (Wyo.1997). "An error warrants reversal only when it is prejudicial and it affects an appellant's substantial rights. The party who is appealing bears the burden to establish that an error was prejudicial." *Candelaria v. State*, 895 P.2d 434, 439–40 (Wyo.1995) (citations omitted); *see also Robinson v. Hamblin*, 914 P.2d 152, 155 (Wyo.1996).

The jury determined that Wendy was not guilty of first-degree murder but was guilty of second-degree murder. It did not, therefore, find that the state had proven the element of premeditation. Wendy argues that the trial court improperly considered premeditation in its sentencing decision and ultimately sentenced her as if she had been convicted of first-degree murder. She cites to these remarks to support her proposition:

But I also, as I said, heard the evidence in this case at the trial, and there was considerable evidence of premeditation in this case. The jury maybe did not find that. There was considerable evidence, at least inferences to be made from that evi-

dence, that the defendant was somewhat less than fully truthful in her account of the events. The bullets were purchased long before the event. The gun was loaded and hidden the night before. I—I've never been one to really believe much in coincidences. And I think it's an extreme coincidence that Martin Trusky's last abusive act happened to land you right next to the gun that you had hidden.

This Court has not addressed whether, in its sentencing determination, the sentencing judge may consider elements that the jury did not find when it determined guilt. The North Carolina Supreme Court, however, addressed that very issue in *State v. Marley*, 321 N.C. 415, 364 S.E.2d 133 (1988). Marley was tried for first-degree murder, but the jury found insufficient evidence to conclude beyond a reasonable doubt that Marley premeditated and deliberated the killing. 364 S.E.2d at 138. The *Marley* court held: "To allow the trial court to use at sentencing an essential element of a greater offense as an aggravating factor, when the presumption of innocence was not, at trial, overcome as to this element, is fundamentally inconsistent with the presumption of innocence itself." 364 S.E.2d at 139. It concluded that, because premeditation and deliberation are the factors distinguishing first-degree murder from second-degree murder, due process and fundamental fairness precluded the trial court from using premeditation and deliberation as aggravating factors when sentencing Marley for second-degree murder. *Id.*

 We agree with the North Carolina Supreme Court and conclude that, in making their sentencing decisions, trial courts are precluded from considering evidence or elements that the jury did not find had been proven by the prosecution. Factors the trial court may consider in its sentencing decision include age, health, children, employment record, intelligence, family history, and education. *Wright v. State*, 670 P.2d 1090, 1093 (Wyo.1983).

 The trial court's discussion of premeditation in this case was, therefore, inappropriate. Nevertheless, we do not believe that the evidence of premeditation and delib-

eration materially affected the trial court's decision. A person who is found guilty of second-degree murder may be sentenced to life in prison.[2] Accordingly, if the evidence of premeditation had weighed heavily in its sentencing decision, the trial court presumably would have sentenced Wendy to a life sentence rather than to a twenty-five- to forty-year sentence. Viewing the comments about premeditation in relation to the other factors the trial court considered in its decision, including Wendy's age, children, and education, we conclude that the court's comments were harmless error. Wendy's sentence fell within the statutorily prescribed range for second-degree murder and outside the range for first-degree murder. Therefore, her claim that she was sentenced as if she had been convicted of first-degree murder is without merit and must fail.

■ Wendy also asserts that the trial court acted improperly when it considered "good time" in determining her sentence. She cites to these remarks:

> Most significantly to me is the fact that there are two types of what is known as "good time" authorized by statute. They are called "statutory good time" and "social good time." Now, those may act to reduce both the minimum and the maximum sentence that is imposed. A lot of people don't know that. They think good time only goes against the maximum, but it also applies against the minimum sentence. As a generalization, it can be said that statutory good time applies against the maximum sentence and special good time applies against the minimum sentence. As an example only, I will tell you a defendant who is sentenced to 15 to 20 years will serve 10 years and two months if all good time is applied to that sentence.

*See* Wyo. Stat. Ann. § 7–13–420 (LEXIS 1999). We do not believe that the trial court considered good time as a factor in Wendy's sentencing. Instead, the judge referred to the possibility of a "good time" reduction to provide Wendy with an incentive to behave appropriately while she was incarcerated.

■ Finally, we address the victim impact testimony. Wyoming law permits the trial court to consider victim impact statements prior to imposing a sentence. Wyo. Stat. Ann. § 7–21–103 (LEXIS 1999). The purpose of "§ 7–21–103 is to permit the sentencing court to consider information about the harm caused by the defendant during the commission of the particular crime for which sentence is about to be imposed." *Mehring v. State*, 860 P.2d 1101, 1116 (Wyo.1993).

■ During Wendy's sentencing, Martin's sister read a letter into evidence from a next-door neighbor. Wendy contends that the neighbor did not fit the definition of victim and, therefore, Martin's sister should not have been allowed to read the neighbor's letter at the sentencing hearing. Wyo. Stat. Ann. § 7–21–101(a)(iii) (LEXIS 1999) defines victim as "an individual who has suffered direct or threatened physical, emotional or financial harm as the result of the commission of a crime or a family member of a minor, incompetent person or a homicide victim."

We conclude that the neighbor was a victim. In his letter to the court, the neighbor wrote that Martin frequently helped him fix things, cared for his animals, and checked on his property when he was away, all without being paid. The neighbor also explained his friendship with Martin and indicated that he socialized with both of the Truskys two or three times a week. Certainly, he suffered emotional, if not financial, harm as the result of Martin's death. The neighbor, therefore, qualified as a victim, and his statement was properly admitted to the trial court.

In *Wright*, 670 P.2d at 1093, we addressed the pressures the sentencing judge is under:

> The judge must isolate himself from (1) the "sob-sister" type who pressures for leniency on the basis of the convicted person's humanity without consideration of the injured victims and other pertinent factors,

---

**2.** Wyo. Stat. Ann. § 6–2–104 (LEXIS 1999) states:

> Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life.

and (2) the vengeful "blood-at-any-cost" type who pressures for "hanging" without consideration of the human nature of the convicted one and the circumstances, surrounding him and the crime itself.

Similarly, the trial court stated in the situation before us:

People think they are helping by sending all of those letters and saying things on one side or the other. But when you get a certain number on each side, I have to conclude that Marty Trusky was either a demon or a saint, and Wendy Trusky is either a demon or a saint. And it depends on which side you're looking from. And that cannot be the totally controlling factor in this case. I had to discount much of this material as the extreme view of family members who see what they want to see and hear what they want to hear, although I have to say that I do not doubt that Wendy Trusky was the victim of domestic abuse.

It is clear from this discussion that Wendy was not materially prejudiced by the reading of the neighbor's letter. The letter was merely one factor the trial court took into consideration when it sentenced her. As stated above, the law allows sentences for second-degree murder to range from twenty years to life imprisonment. Wyo. Stat. Ann. § 6–2–104 (LEXIS 1999). The trial court did not abuse its discretion in sentencing Wendy to a term of twenty-five to forty years.

Affirmed.