# IN THE SUPREME COURT, STATE OF WYOMING

# 2013 WY 46

APRIL TERM, A.D. 2013

April 19, 2013

TRAVIS J. KOVACH,

Appellant
(Defendant),

v.

S-12-0150

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Sublette County*
*The Honorable Marvin L. Tyler, Judge*

***Representing Appellant:***

Gerard R. Bosch, Law Offices of Jerry Bosch, Wilson, WY; and Tim Newcomb, Laramie, WY. Argument by Mr. Newcomb.

***Representing Appellee:***

Gregory A. Phillips, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Theodore R. Racines, Senior Assistant Attorney General; and Jeffrey Pope, Assistant Attorney General. Argument by Mr. Pope.

***Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.***

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]     Travis Kovach was a passenger in a vehicle traveling on a narrow backcountry road.  As the vehicle in which Kovach was traveling passed another oncoming vehicle, the two vehicles clipped each other.  Kovach pursued the other vehicle, and after catching up with it, he assaulted the vehicle's seventy-three-year-old driver and sixty-seven-year-old passenger.  Kovach then forced the two men back to his hunting camp, where he again assaulted them.

[¶2]     A jury found Kovach guilty of numerous charges, including false imprisonment, felonious restraint and aggravated assault and battery.  On appeal, Kovach contends the prosecutor suppressed exculpatory evidence in violation of his state and federal due process rights.  He also challenges the district court's order requiring him to disclose witness statements and its imposition of sanctions related to that order;  alleges misconduct in the prosecutor's failure to correct false or misleading testimony;  alleges the district court relied on impermissible information in sentencing;  and alleges the district court erred in *sua sponte* issuing an amended judgment correcting the fine imposed against Kovach.  We affirm.

## ISSUES

[¶3]     Kovach presents eight issues on appeal, which we consolidate and restate as follows:

     1.     Did the prosecutor suppress exculpatory evidence in violation of Kovach's federal and state due process rights?

     2.     Did the district court abuse its discretion and violate Kovach's federal and state constitutional rights when it ordered him to disclose witness statements and then limited his cross-examination of two prosecution witnesses as a sanction for failure to comply with that order?

     3.     Did the prosecutor commit plain error in violation of Kovach's due process rights by failing to correct the testimony of two witnesses?

     4.     Did the district court commit plain error in its sentencing of Kovach by relying on uncharged misconduct evidence and by *sua sponte* issuing an amended judgment correcting the fine imposed against Kovach?

## FACTUAL BACKGROUND

[¶4]     On October 15, 2010, Travis Kovach was hunting and camping in the LaBarge Creek/Little Fall Creek area.  Kovach was thirty-three years old, approximately six-feet,

1

one-inch tall, and weighed about two hundred pounds. His hunting and camping party also included, among others, MW, Isaac Zimmerman, David Huber, and Dan Frear. A few hundred yards away from the Kovach campsite was another campsite, this one occupied by two brothers, Jess Ribelin, age seventy-three, and Richard Ribelin, age sixty-seven. The Ribelins were from Kansas and had eight others in their party, including Jess Ribelin's grown sons and a friend.

[¶5]    Late in the afternoon on October 15th, Kovach and Zimmerman borrowed MW's vehicle, an Escalade, to drive to LaBarge to pick up Kovach's son. Kovach asked Zimmerman to drive, which Zimmerman explained as follows:

> Q.    Now I'm going to take you back to the camp early in the day about 3:00. Had you been drinking that day?
> A.    Yes, I had.
> Q.    How much?
> A.    I had a couple beers in the morning and a shot of whiskey.
> Q.    So maybe three beverages?
> A.    Correct.
> Q.    And are you the one who got the keys from [MW]?
> A.    I don't recall, I don't know.
> Q.    Do you recall going into her tent and getting the keys or do you recall that that was Mr. Kovach?
> A.    I don't recall how I wound up with the keys at all.
> Q.    Okay. Do you recall why you were driving that day instead of Mr. Kovach?
> A.    He asked me to drive because we were going to go pick up his son I believe.
> Q.    And do you recall why he asked you to drive?
> A.    He had been drinking and he didn't feel like he needed to be driving with his son.
> Q.    It was because he wasn't sober; is that correct?
> A.    Correct.

[¶6]    At the same time Zimmerman and Kovach were driving on LaBarge Creek Road headed into town, Jess and Richard Ribelin were on LaBarge Creek Road returning to camp after a supply run into town. The two vehicles met, and as they passed on the narrow road, they clipped each other. The collision damaged the side mirror on the Escalade in which Zimmerman and Kovach were traveling, and it left a four to six-inch black mark on the rear wheel well of the Dodge Ram dually truck in which the Ribelins were traveling. Both Ribelins testified that, as the vehicles passed each other, they heard

a noise that sounded like a rock bouncing up and hitting the fender and that they did not realize that the vehicles had made contact. Shortly after the collision, Zimmerman and Kovach turned around and drove after the Ribelins. When they caught up to the Ribelins, Zimmerman and Kovach flashed their lights and honked their horn, and the Ribelins pulled over.

[¶7]    What happened next is in dispute. Jess Ribelin testified that he pulled his vehicle over when he saw the Escalade behind him flashing its lights and honking its horn, and that after both vehicles were stopped, he saw Kovach jump out of the Escalade. He testified that through his open window he could hear Kovach swearing at him and that he was concerned that Kovach might attack him because of the way he got out of his vehicle, the way he was swearing, and because earlier in the day, he had met Kovach and Kovach had said he was going to kick some hunters' asses for using his friend's normal campsite. Jess Ribelin further testified:

> I told my brother, I said, "I better get out and see what they want" and so I got out of the truck. I have a little trouble getting out because I just had an operation on my knee so it wasn't as workable as it should have been, and when I stepped out he was still raising all kinds of cane so I grabbed the fencing pliers I had there that would help protect me if he was going to attack me.

[¶8]    Jess Ribelin and Richard Ribelin testified that Kovach attacked and injured first Jess and then Richard when Richard intervened to help Jess. The Ribelin brothers testified that during the course of the attack, Kovach broke out both side mirrors on the Ribelin vehicle, drew a large caliber pistol, fired a shot at the ground with the pistol, threatened both men with the gun, and struck Richard Ribelin in the face with the gun. Both men also testified that Kovach used the threat of the firearm to force Jess Ribelin into the passenger seat of the Ribelin vehicle and to force Richard Ribelin into the passenger seat of the Escalade. The brothers testified that with Kovach driving the Ribelin vehicle and Isaac Zimmerman driving the Escalade, the four drove to Kovach's campsite. Jess Ribelin testified that once they were at the camp, Kovach struck him in the ribs with the fencing pliers and knocked him to the ground. Richard Ribelin testified that Kovach struck him in the head with his elbow, knocking him to the ground.

[¶9]    Kovach did not testify, but he gave statements to law enforcement, and those recorded statements were presented to the jury. In those statements, Kovach denied that he had consumed any alcohol before the incident with the Ribelins. He reported that once he caught up with the Ribelin vehicle, he wanted only to confront the Ribelins about the damage done to the Escalade. He stated that when he approached the Ribelin vehicle, Jess Ribelin attacked him with a pair of fencing pliers, and that after that attack, any injuries he caused to either Jess Ribelin or his brother Richard were in self defense.

3

[¶10] Kovach admitted that he used the fencing pliers to break out a mirror on the Ribelin vehicle. He also admitted that he was carrying a .44 Magnum revolver and that he drew his firearm, but he denied pointing the firearm at anyone, threatening anyone with the firearm, or discharging the firearm. Kovach admitted to taking the Ribelins back to his hunting camp after injuring them, but he stated that his only reason for doing so was to have them apologize to MW for the damage done to her vehicle. He denied that he hit, shoved or injured either of the Ribelins after bringing them back to his camp.

[¶11] Isaac Zimmerman was called as a defense witness and confirmed much of Kovach's version of events. He testified that during the initial altercation on the road, Kovach acted in self defense because Jess Ribelin swung the fencing pliers at him. He denied that Kovach pointed his gun at anyone or fired the weapon. As to the events at the campsite, Zimmerman testified that he saw Kovach knock the Ribelins to the ground, with no provocation by the Ribelins, but he denied seeing Kovach hit Jess with the pliers or elbow Richard in the head.

[¶12] MW was called as prosecution witness. She testified as to what occurred at the hunting camp and stated that she saw Kovach knock the Ribelins to the ground. She denied seeing Kovach hit Jess with the pliers or elbow Richard in the head, but she agreed that the Ribelins had done nothing to provoke Kovach's attack at the campsite. MW intervened to stop Kovach's assault and assist the Ribelin brothers, and she directed other men in the camp to restrain Kovach and take him to a camper. MW and her husband then helped the Ribelins to the Escalade, and MW drove the men back to their own camp, with her husband following in the Ribelin vehicle. Back at the Ribelin camp, MW, a nurse, attended to the injured men and determined that they should be taken into town for medical treatment. She then drove the two men to a clinic, contacting law enforcement on the way to report the incident.

[¶13] The Ribelin brothers were treated at the Marbleton clinic. Jess Ribelin suffered two fractured ribs, damage to his inner ear, and multiple cuts, abrasions, and bruises to his face, chest and back. Richard Ribelin suffered what the treating physician described as "a major injury to the facial structure," including a broken nose, a fractured eye socket, loosened front teeth, and cuts and bruises to his face.

[¶14] Kovach had abrasions and swelling on his right hand and reported to law enforcement that his shoulder muscles were sore from being grabbed. He reported no other injuries and received no medical treatment.

[¶15] Kovach was arrested and subsequently went to trial on charges that included: two counts of kidnapping, two counts of felonious restraint, two counts of battery, one count of unauthorized use of a vehicle, one count of property destruction, and two counts of aggravated assault and battery. On January 5, 2012, following a five-day trial, a jury

returned a verdict finding Kovach not guilty as to the kidnapping charges, not guilty as to the felonious restraint of Richard Ribelin, but guilty as to the false imprisonment of Richard Ribelin, guilty as to the felonious restraint of Jess Ribelin, guilty as to both battery charges, guilty as to both aggravated assault and battery charges, and guilty as to the unauthorized use of a vehicle and property destruction charges.

[¶16] On January 20, 2012, Kovach filed a motion for new trial. He argued the verdict should be set aside because the district court improperly restricted Kovach's cross-examination of two prosecution witnesses and because the prosecution suppressed exculpatory evidence, contending both errors violated his state and federal constitutional rights. On March 6, 2012, following an evidentiary hearing, the district court denied Kovach's new trial motion. Additional facts related to Kovach's new trial motion will be set forth as needed in our discussion of Kovach's related claims on appeal.

[¶17] On March 23, 2012, the district court held a sentencing hearing. Kovach requested that the court impose a sentence of supervised probation and restitution, and the State requested a sentence of incarceration for a term of not less than sixteen years nor more than twenty years. The court sentenced Kovach to prison for a term of twelve to eighteen years, imposed three fines of $3,000 each against Kovach, and ordered restitution. On April 2, 2012, the court entered its Judgment and Sentence, which on page eight of nine ordered Kovach to pay, among other assessments, fines in the amount of $6,000. On April 5, 2012, the court entered its Amended Judgment and Sentence, which crossed out the reference to $6,000 in fines, and inserted the amount of $9,000 in its place. Additional facts related to Kovach's sentencing will be set forth as needed in our discussion of Kovach's related claims on appeal.

## DISCUSSION

### I. Suppression of Exculpatory Evidence

[¶18] Kovach argues that the prosecutor suppressed favorable evidence material to his guilt in violation of both his federal and state due process rights. In particular, Kovach asserts that the prosecutor suppressed: 1) an e-mail sent to Isaac Zimmerman's attorney threatening to charge Mr. Zimmerman for his involvement in Kovach's crimes if Mr. Zimmerman did not cooperate with the prosecutor; 2) a conversation between the prosecutor and MW in which the prosecutor allegedly promised to reopen MW's unrelated sexual assault case in exchange for her favorable testimony; and 3) the statement of David Huber, a member of Kovach's hunting camp, taken by the prosecutor's investigator. Kovach contends that the Zimmerman and MW evidence could have been used for impeachment purposes, and that the Huber statement contained favorable evidence that could have altered the outcome of the trial.

[¶19] Our discussion will first address Kovach's argument that the prosecutor suppressed evidence in violation of the federal constitution, and we will then turn to Kovach's separate arguments under the state constitution. We generally review a district court's denial of a new trial motion for an abuse of discretion, but because Kovach's suppression argument is a constitutional claim, our review is *de novo*. *Lawson v. State*, 2010 WY 145, ¶ 19, 242 P.3d 993, 1000 (Wyo. 2010); *Hicks v. State*, 2008 WY 83, ¶ 30, 187 P.3d 877, 883 (Wyo. 2008).

## A.    Fourteenth Amendment Suppression Analysis

[¶20] A prosecutor's suppression of evidence that is favorable to a defendant and material to his guilt violates the Due Process Clause of the Fourteenth Amendment. *Lawson*, ¶ 20, 242 P.3d at 1000 (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963)). To establish a *Brady* violation, a defendant must show "that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material." *Lawson*, ¶ 21, 242 P.3d at 1000 (citing *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97). "It is well-established that '[f]avorable evidence includes impeachment evidence.'" *Chauncey v. State*, 2006 WY 18, ¶ 13, 127 P.3d 18, 21 (Wyo. 2006) (quoting *Davis v. State*, 2002 WY 88, ¶ 18, 47 P.3d 981, 985–86 (Wyo. 2002)).

[¶21] With regard to suppression, this Court has recognized that "[t]he essence of *Brady* is the discovery of information *after the trial,* which was known to the prosecution but unknown to the defense during the trial." *Thomas v. State*, 2006 WY 34, ¶ 16, 131 P.3d 348, 353 (Wyo. 2006) (citing *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (italics in original)). With regard to materiality, we have said evidence that is cumulative is not material. *Chauncey*, ¶ 21, 127 P.3d at 23 (citing *Relish v. State*, 860 P.2d 455, 460 (Wyo. 1993)). We have further explained:

> Evidence is material under *Brady* only when a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *Thomas v. State*, 2006 WY 34, ¶ 15, 131 P.3d 348, 353 (Wyo. 2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* When the defense makes a specific request and the prosecution fails to respond fully, the reviewing court may consider directly any adverse effect the failure to respond might have had on the preparation or presentation of the defendant's case. *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384. "The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with

6

an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." *Id.* In judging materiality, the focus is on the cumulative effect of the withheld evidence, rather than on the impact of each piece of evidence in isolation. *Id.*; *United States v. Nichols*, 2000 WL 1846225, 2000 U.S.App. Lexis 33183, 2000 Colo. J. C.A.R. 6735 (10th Cir. 2000).

*Lawson*, ¶ 22-23, 242 P.3d at 1000-01.

[¶22]  Using this framework, we turn to the evidence Kovach contends the prosecutor suppressed in violation of his Fourteenth Amendment due process rights.  The State concedes that none of the evidence at issue was provided to Kovach.  Our inquiry therefore is whether the evidence was suppressed; that is to say, available to the prosecutor during the trial but not to Kovach and, if so, whether the evidence was favorable and material.

### 1.     *E-mail Re Isaac Zimmerman Charges*

[¶23]  The first allegedly suppressed evidence we address is a December 8, 2010, e-mail the prosecutor sent to Isaac Zimmerman's attorney.  The prosecutor attached to the e-mail a criminal warrant for Mr. Zimmerman's arrest and a draft criminal information charging Mr. Zimmerman with reckless endangering and with accessory before the fact to kidnapping and felonious restraint.  The e-mail included the following message:

> Against the wishes of the Sublette County Sheriff's Office, I chose not to prosecute Mr. Zimmerman due to Mr. Zimmerman's cooperation with the State, and my belief Mr. Zimmerman would make a favorable witness at trial against Mr. Kovach.   It now appears I was wrong about Mr. Zimmerman's willingness to assist in this matter.
>
> Mr. Zimmerman was a clear accessory before the fact to kidnapping and felonious restraint, as well as committing an act of reckless endangerment by knowingly transporting a victim for Mr. Kovach's continued physical abuse and terrorization.
>
> I chose not to charge Mr. Zimmerman based on a totality of circumstances, and those circumstances have now changed. Now that Mr. Zimmerman has changed his mind about

7

lending assistance to the State, I have changed mine about charging him with the crimes he committed.

Will you accept service on behalf of your client?

[¶24] By a post-trial affidavit dated January 17, 2012, Isaac Zimmerman stated, "After receiving this information from the Sublette County Attorney, I decided to meet with the Sublette County Attorney without counsel and cooperate with the Sublette County [Attorney] as he wanted."

[¶25] Kovach contends that this e-mail was material impeachment evidence because it could have been used to impeach Isaac Zimmerman's testimony by showing that he was pressured to cooperate with the prosecutor and testify favorably for the State. Although the e-mail certainly shows that Mr. Zimmerman was under pressure to testify favorably for the State, we do not agree with Kovach that the prosecutor's failure to turn the e-mail over to Kovach resulted in a *Brady* violation. The record shows that Kovach knew before trial that Mr. Zimmerman had been threatened with prosecution, and the record further shows that the e-mail would have been nothing more than cumulative evidence of those threats.

[¶26] We note at the outset that, whatever pressure may have initially been brought to bear on Isaac Zimmerman for his cooperation, the State did not follow through on its efforts to compel Mr. Zimmerman to testify as a prosecution witness. During the trial, Mr. Zimmerman was called as a defense witness, not as a State witness, and as indicated above, Mr. Zimmerman's testimony matched Kovach's version of events in many respects.

[¶27] As to the prosecution's efforts to secure Isaac Zimmerman's favorable testimony, the record is far from silent. Mr. Zimmerman testified on direct examination by defense counsel:

> Q. Okay. Now Mr. Zimmerman, you and I have spoken. Have you spoken to anybody else about this matter?
> A. I spoke to the officers and the county attorney and the investigator.
> Q. And how many times did you speak to them?
> A. Five times total I believe.
> Q. Okay. Have you been promised anything for your testimony here today?
> A. No.
> Q. Have you been threatened about your testimony?
> A. Yes, I have.

8

Q. And how so?

A. I was threatened with charges against me as well.

Q. Okay. And how did that happen?

A. I guess I wasn't giving them what they wanted to hear.

Q. And who made those threats to you?

A. I believe it was [the prosecutor's investigator].

Q. Anybody else?

A. I believe [the prosecutor] also said that, you know – I don't believe he – I take that back. I don't think [the prosecutor] actually made any threats, he just said there was some pressure for me to be charged.

[¶28] On cross-examination by the prosecutor, Isaac Zimmerman again testified to the threatened prosecution against him:

Q. Okay. You and I have spoke several times; is that correct?

A. Yes.

Q. And that's what you just testified to?

A. Yes.

Q. Now [defense counsel] has indicated that you were threatened with prosecution; is that correct?

A. Correct.

Q. And was that ever explained to you what charges you would be facing if you were not cooperative?

A. Yes.

Q. And what charges were those?

A. Accessory.

Q. Okay. Now do you recall driving a beaten man to Travis Kovach's camp at Travis Kovach's direction?

A. Yes.

Q. And do you recall what I told you as to why I was not going to prosecute you?

A. Yes.

Q. And what was that?

A. Because you didn't think I had anything to do with it.

Q. Does it refresh your recollection that I told you I didn't want to ruin a young man's life because he didn't do the right thing?

A. Yes.

Q. Now you were scared during this whole ordeal, weren't you?

A. Yes.

Q. And in hindsight you probably would have done things differently, wouldn't you?

A. Yes.

Q. You would have tried to help those old men, wouldn't you?

A. Yes.

Q. But you didn't do those things?

A. No.

Q. And why?

A. I didn't know what to do.

Q. It was out of control, wasn't it?

A. Yes.

Q. Mr. Kovach was out of control, wasn't he?

A. Yes.

[¶29] On further cross-examination by the prosecutor, Isaac Zimmerman adhered to his testimony that Kovach did not fire his weapon and it was only because of pressure by the prosecutor's investigator that he ever said otherwise:

Q. And so what did you tell [the prosecutor's investigator] on November 10th?

A. I was pretty angry at that point because we had been talking on for quite awhile and I just told him what he wanted to hear.

Q. Oh, okay. And what was it that he wanted to hear?

A. He wanted to hear that there had been a gun fired.

Q. And you told him he probably fired a shot, correct?

A. Correct.

Q. And you told him he probably had the gun out, correct?

A. Correct.

Q. But you're now saying that was only because you were telling [the prosecutor's investigator] what he wanted to hear?

A. I was getting a lot of pressure from [the prosecutor's investigator].

10

Q.  You got a lot of pressure from [defense counsel]?
A.  No.
Q.  Or Mr. Kovach?
A.  No.

[¶30]  Finally, on re-direct examination by defense counsel, Isaac Zimmerman again insisted that Kovach had not fired his weapon and that any statements to the contrary were the result of pressure by the prosecution.

Q.  Now [the prosecutor] had asked you about this gun issue and he had you read a statement.  Prior to that time had you already given two statements to law enforcement?
A.  Yes.
Q.  You had already given a statement to my investigator?
A.  Yes.
Q.  In all of those statements did you say you did not hear the gun?
A.  I did.
Q.  Okay.  And actually in the statement that [the prosecutor] read to you earlier on, in that statement you told [the prosecutor's investigator] that you didn't hear the gun either; isn't that right?
A.  Correct.
Q.  And it wasn't until [the prosecutor's investigator] threatened you that you told him what he wanted to hear?
[PROSECUTOR]:  Objection, leading.
COURT:    Sustained.
Q.  Why did you eventually say to [the prosecutor's investigator] that, you know, "I think that's what happened"?
A.  Because of the pressure that they were putting on me.

[¶31]  Isaac Zimmerman's trial testimony clearly informed the jury that he was threatened with prosecution and that he felt pressured to cooperate with the prosecutor and testify favorably for the State.  The prosecutor's e-mail to Mr. Zimmerman's attorney would have been cumulative evidence to the same effect.  *See Chauncey*, ¶ 21, 127 P.3d at 24 ("Where, as in the instant case, a witness for the State has been exhaustively impeached, both generally and as to the specific issue addressed by the suppressed evidence, we do not believe that one additional piece of cumulative information makes the verdict unworthy of confidence.").  Additionally, defense counsel's examination of

11

Mr. Zimmerman shows that Kovach knew of the threats in time to use them during the trial. Any doubt concerning Kovach's access to that information was further resolved by the testimony of both Mr. Zimmerman and defense counsel during the evidentiary hearing on Kovach's new trial motion. Mr. Zimmerman testified:

> Q. You were very cooperative with [defense counsel] through the entire trial; is that correct?
> A. Yes.
> Q. And very cooperative with [defense counsel] prior to trial; is that correct?
> A. Correct.
>
> . . . .
>
> Q. Now did you ever tell [defense counsel] that you had seen or heard of an e-mail with a criminal information from my office?
> A. Yes, I believe I did.
> Q. When did you tell him that?
> A. I don't know.
> Q. Did you bring that to his attention after the trial was over?
> A. I think it was before, but I'm not sure.
> Q. Now he actually brought that to your attention; is that correct? After the trial he contacted you and said, "Mr. Zimmerman, I know that there is an affidavit" – or, excuse me, "an e-mail and some charging information," he brought that to your attention; isn't that correct?
> A. Yes, yes.
> Q. Okay. You didn't bring that to his attention?
> A. No.
> Q. How many days after trial was it that he brought that to your attention?
> A. I don't know, I don't recall. Maybe a week, maybe two weeks.
> Q. But you didn't contact him out of the blue and tell him about it; is that correct?
> A. No.

[¶32] Kovach's counsel testified:

> Your Honor, I mean – let me put it in the form of testimony. Mr. Zimmerman had approached me after being interviewed several times and said that he was feeling threatened and was there anything that I could do for him and

12

I said no, I said I couldn't, but I said I could give him some names of some lawyers in Pinedale.

[¶33] We are satisfied that the prosecutor's failure to provide the Isaac Zimmerman e-mail to defense counsel did not result in a *Brady* violation. The evidence was cumulative, and defense counsel had information relating to the threats against Zimmerman before trial. *See Thomas*, ¶ 18, 131 P.3d at 353 (defendant failed to show a *Brady* violation where evidence was available and used during trial).

## 2.   *Evidence of Promises to MW*

[¶34] We turn then to the next evidence Kovach contends that the prosecutor impermissibly suppressed—an alleged promise the prosecutor made to MW to reopen her sexual assault case in exchange for her favorable testimony. Kovach argues that this impeachment evidence was important because the prosecution attempted to portray MW as a reluctant witness against Kovach, when according to Kovach, the prosecution had in fact made a deal to procure MW's favorable testimony. We reject this alleged suppression as a *Brady* violation because the record does not support Kovach's characterization of the conversation between the prosecutor and MW. *See Chauncey*, ¶ 17, 127 P.3d at 22 (rejecting *Brady* argument as to an interview because the argument mischaracterized the evidence).

[¶35] Kovach offered the following affidavit statements from MW in support of his new trial motion.

> 5.    I was interviewed on several occasions by the Sublette County Sheriff, Sublette County Investigator … and the Sublette County Prosecuting Attorney.
>
> 6.    At one time during these interviews I was informed by Sublette County officials that I was the State's most important witness and that I was going to help them put Mr. Kovach away.
>
> 7.    Weeks before trial I met with the Prosecuting Attorney and him and I discussed my rape that occurred some years prior to this incident. The Prosecuting Attorney expressed to me that he felt the prosecution of the case was not handled properly. He said that after the Kovach case was over, he would look into the case and see if there was anything missed and might be able to reopen it.

13

8.      The night before I was to testify I met with the Prosecuting Attorney at his office. We sat in his office for about an hour and a half and talked about among other things my testimony.

9.      During this conversation the Prosecuting Attorney told me that Jess Ribelin was hit with the pliers at camp. I told the Prosecuting Attorney that I was certain that Jess Ribelin was not hit with the pliers as I was standing right next to him. We argued about this point and the Prosecuting Attorney said he believed Mr. Ribelin and it was dropped.

10.     I also [asked] the Prosecuting Attorney during this conversation what would happen if I ever came across the man that attacked me. I told the Prosecuting Attorney that I would beat the crap out of him and asked what would happen to me. The Prosecuting Attorney told me they would have to arrest me, but would not charge me.

[¶36]  During the evidentiary hearing on Kovach's new trial motion, MW testified that the prosecuting attorney made no promise to reopen her sexual assault case and there was no quid pro quo exchange for her favorable testimony. On direct examination by defense counsel, MW testified:

> Q.      Was there at some point any discussion about reopening the case or restarting the [sexual assault] case or something of that nature?
> A.      Right, [the prosecutor] had said that after this was done and over with, Kovach's trial, that he would have his investigator -- that he might have his investigator look into it.
> Q.      Was there any explanation as to why it needed to wait until after the Kovach trial was done?
> A.      Just because he was busy with this trial.

[¶37]  On cross-examination by the prosecutor, MW testified:

> Q.      Did [defense counsel] approach you about signing a different affidavit than this one?
> A.      He had e-mailed me one prior to this one to look over, yes.
> Q.      And was it the same as this one?
> A.      No.

14

Q. And what were the differences in the affidavit that you didn't sign versus the one that's presented here today?

A. On number 7 on the list about that once the case was over that you had promised me you would look into my case.

Q. And why did you not sign that affidavit?

A. Because that's not what was said, it was that you – after this was all done and over with that you might look into it, you and your investigator or your investigator.

Q. Have I ever promised you anything –

A. No.

Q. -- for your testimony?

A. No.

Q. Have I ever given you any representations of incentives if you testified?

A. No.

Q. When you and I met, we talked about your role as a witness in Mr. Kovach's case; is that correct?

A. Yes.

Q. And we also would talk about your role as a victim in a different case; is that correct?

A. Yes.

Q. Did you ever believe that those conversations were in any way intertwined between your prior case and Mr. Kovach's case?

A. No, I felt when we were talking about Travis' case that I was the witness and then when you and I were talking that it was simply you and I talking, not the prosecuting attorney and the witness talking, just that we were having a conversation.

Q. And did you feel like I was listening to your concerns and the concerns you expressed--

A. Yes.

Q. --in your role as a witness?

A. Yes.

Q. Now [defense counsel] has asked you about the night before the trial –

A. Uh-huh.

Q. --when we discussed what would happen if you saw your alleged perpetrator in the grocery store?

A. Yes.

Q. We had some pretty serious conversations about your rape incident that night, did we not?

A. Yes.

Q. When you brought up seeing him in the grocery store and what you would do, did you present that question to me in a serious –

A. No.

Q. --question?

A. No.

Q. If I recall correctly you were actually laughing or smiling a bit when you asked that question?

A. Correct.

Q. And in many ways it was a way to lighten the mood from what had been a very serious conversation; is that correct?

A. Yes, yeah.

Q. And when I responded, "Well, you would have to be arrested, but I'm not sure you'd be charged" and I smiled when I said that, did you feel like that I was making a promise of any kind?

A. No, no.

[¶38] MW's testimony is clear that the prosecutor made no promises to her in exchange for her favorable testimony. And, her testimony during Kovach's trial was consistent with the lack of any such promise. MW testified that she at no time saw Kovach hit Jess Ribelin with a pair of fencing pliers, which was contrary to the testimony the prosecution wanted from her. She also openly disagreed with the prosecutor at another point in her testimony, when the prosecutor asked her to confirm her belief that Jess Ribelin's ear was injured in the manner Mr. Ribelin had reported, that is, when Kovach shoved the fencing pliers into his ear canal:

Q. Just as a – your common, every-day experience and your common sense, did what you see inside his ear, did that match the description as to how he got it?

A. Being hit with a fist could have caused the same thing too, but my concern –

Q. [MW], that's not what you said yesterday evening, was it?

A. Yes, it was.

Q. Do you recall having a conversation with me yesterday evening?

A. Yes, I do.

16

> Q.     Do you recall telling me that it was unlikely that
> that could have been caused by a fist because it was inside the
> ear canal?
> A.     That is not what I said, ….

[¶39]  Kovach bears the burden of proving that exculpatory evidence existed but was suppressed.  *Wilkening v. State*, 2007 WY 187, ¶ 12, 172 P.3d 385, 388 (Wyo. 2007).  We find that Kovach did not meet his burden of showing that a promise was exchanged between the prosecutor and MW, and we therefore reject the claimed *Brady* violation.

### 3.     *Dave Huber Interview*

[¶40]  On July 26, 2011, the prosecutor's investigator interviewed Dave Huber, a member of Kovach's hunting camp who was present when Kovach returned to the camp with the Ribelin brothers. This interview was recorded and transcribed, but it was not provided to defense counsel.

[¶41]  As noted above, the burden is on Kovach to prove that material exculpatory evidence was suppressed.  *See Wilkening*, ¶ 12, 172 P.3d at 388.  On appeal, however, Kovach has made no argument as to what portion of the Huber interview was exculpatory or how the evidence was material to the outcome of the trial.  Kovach does no more than identify the interview as evidence the prosecution failed to turn over, and he thus has not met his burden of proving a *Brady* violation.

[¶42]  Additionally, the record shows that defense counsel had the same information the prosecution had as to any evidence Mr. Huber could provide.  *See Thomas*, ¶ 16, 131 P.3d at 353 ("The essence of *Brady* is the discovery of information *after the trial,* which was known to the prosecution but unknown to the defense during the trial.").  Specifically, the record contains an affidavit signed by Mr. Huber in which he attested:

> 5.     I was interviewed by an investigator from the [defense counsel's] office.
>
> 6.     I  was  also  interviewed  by  [the  prosecutor's investigator], an investigator from Sublette County, in late July of 2011 about this matter.
>
> 7.     After  being  interviewed  by  [the  prosecutor's investigator], the investigator from Sublette County, I was also interviewed by [defense counsel] about this matter.  My interview with [defense counsel] occurred before December, 2011.  During this interview, I told [defense counsel] I had

given a tape recorded interview to [the prosecutor's investigator] at my home in Wyoming.

8.  During each interview with both investigators and [defense counsel], I told the same story about what I recalled from the confrontation at the Kovach hunting camp on October 15, 2010.

9.  During each interview, I stated that I heard Travis Kovach and one of the other men arguing with each other. Although I don't recall what was said, I do recall telling each interviewer that both men were using loud voices.

10.  During each interview, I stated that I did not see Travis Kovach hit anyone.

11.  During each interview, I state[d] that I never heard anyone mention at camp that Travis Kovach had fired his gun or used his gun to hit the other gentlemen.

[¶43]  Based on our reasoning above, we are unable to find a *Brady* violation in the prosecution's failure to disclose the Huber transcript to defense counsel. Nonetheless, we do not condone the failure to disclose the evidence, and we remind prosecutors that when they "fail … to disclose exculpatory evidence they not only fail in their duty and risk otherwise justifiable convictions, but expose themselves to the charge that they have violated Rule of Professional Conduct 3.8." *Lawson*, ¶ 53, 242 P.3d at 1009.

## B.  State Constitution Suppression Analysis

[¶44]  As an alternative to the rigors of the *Brady* analysis, Kovach offers an independent state constitutional basis to find reversible error in the prosecution's failure to disclose the above-discussed evidence. Kovach contends that under the Wyoming Constitution, a prosecutor must disclose to the defense not only favorable material evidence but also any ***relevant*** evidence in its possession. Specifically, Kovach argues that the failure to disclose such evidence violates article I, § 6 of the Wyoming Constitution--the Wyoming due process guarantee, as well as the Wyoming constitutional provisions governing effective assistance of counsel, the right to present a complete defense, the right to effective cross-examination and separation of powers. Kovach also argues that a prosecutor's decisions regarding evidence disclosure are an exercise of the State's police power that affect a defendant's fundamental rights and such decisions are therefore subject to a strict scrutiny level of judicial review.

[¶45] In determining whether the Wyoming Constitution provides greater protection than its federal counterpart, we have identified six non-exclusive criteria to be considered: "1) the textual language of the provisions; 2) differences in the texts; 3) constitutional history; 4) preexisting state law; 5) structural differences; and 6) matters of particular state or local concern." *O'Boyle v. State*, 2005 WY 83, ¶ 24, 117 P.3d 401, 408 (Wyo. 2005) (citing *Saldana v. State*, 846 P.2d 604, 622 (Wyo. 1993)). Applying these criteria, we conclude that Kovach has failed to articulate a separate and independent state constitutional basis for imposing such a broad disclosure obligation on the prosecution.

[¶46] As discussed above, the basis for the *Brady* rule is the due process clause of the Fourteenth Amendment. The U.S. Supreme Court has explained:

> The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[.]

*United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3379-80 (1985) (footnotes omitted).

[¶47] This Court likewise generally addresses a prosecutor's suppression of evidence as a due process question. *See Lawson*, ¶ 53, 242 P.3d at 1009; *Wilkening*, ¶ 7, 172 P.3d at 386-87; *Chauncey*, ¶ 12, 127 P.3d at 21. Due process being our usual concern in these cases, we turn first to Kovach's argument that Wyoming's due process provision imposes a greater disclosure obligation than its federal counterpart.

[¶48] Our decisions addressing a prosecutor's failure to disclose evidence have analyzed the suppression under the Fourteenth Amendment and have followed the analysis prescribed by the U.S. Supreme Court. Our attention in that analysis has been not on the prosecutor's conduct but instead on the materiality of the suppressed evidence and its impact on the trial's fairness. *Lawson*, ¶ 53, 242 P.3d at 1009; *Wilkening*, ¶ 7, 172 P.3d at 386-87; *Chauncey*, ¶ 17, 127 P.3d at 22-23. In *Lawson*, we explained:

> [T]he constitutional obligation [to disclose unrequested information] is [not] measured by the moral culpability, or willfulness, of the prosecutor. If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it. Conversely, if evidence actually has no probative significance

at all, no purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of the evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

*Lawson*, ¶ 53, 242 P.3d at 1009 (quoting *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401 (1976)).

[¶49] Kovach's argument based on the Wyoming Constitution essentially reverses our usual and accepted analysis. Rather than looking to the character of the evidence and the suppression's effect on the trial, Kovach focuses entirely on the prosecutor's power and discretion--and the need to restrain prosecutorial authority. Applying the *O'Boyle* factors to Wyoming's due process provision, we are unable to find support for Kovach's proposed approach to this question.

[¶50] First, the text of Wyoming's due process guarantee is indistinguishable from the text of the Fourteenth Amendment's due process clause, and Kovach thus cannot, and does not attempt to, support his argument by reference to textual differences. *See* Wyo. Const. art. I, § 6 ("No person shall be deprived of life, liberty or property without due process of law."), U.S. Const. amend. XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law"). Second, Kovach's argument is at odds with our preexisting state law. Kovach contends that the Wyoming Constitution mandates that the prosecution disclose all relevant evidence in its possession, effectively asserting a constitutional right to discovery--a right that this Court has repeatedly held a criminal defendant does not have:

> Although there is no constitutional right to discovery, a defendant has a constitutionally protected right to present a defense. *Ceja* [*v. State*], 2009 WY 71, ¶ 13, 208 P.3d at 68; *Dysthe v. State*, 2003 WY 20, ¶ 5, 63 P.3d 875, 879 (Wyo. 2003). A defendant may request discovery of certain items from the state, but the state is only required to provide such information as indicated by statute, rule or case law. *Ceja*, 2009 WY 71, ¶ 13, 208 P.3d at 68.

*Washington v. State*, 2011 WY 132, ¶ 17, 261 P.3d 717, 722 (Wyo. 2011); *see also Gale v. State*, 792 P.2d 570, 575 (Wyo. 1990) (defendant "does not have a general state or federal constitutional right to conduct wide-ranging criminal discovery in the state's files").

20

[¶51] We turn then to our next consideration, the history of the Wyoming constitutional provisions. This is where Kovach directs most of his argument with a lengthy recitation of Wyoming's constitutional history. That history, however, gets us no closer to the interpretation urged by Kovach because he has not demonstrated how that history shifts a Wyoming due process analysis away from the fairness of the trial and our confidence in the trial's outcome and toward a focus on the prosecutor's conduct. As we observed in *Lawson*, the cornerstone of our analysis is the defendant's fair trial, and our search for constitutional error must therefore focus on the character of the evidence suppressed and not on the prosecutor's character or actions. *Lawson*, ¶ 53, 242 P.3d at 1009.

[¶52] The remainder of Kovach's state constitutional argument is likewise unpersuasive. Suppression of evidence does not present a separation of powers issue. The prosecutor decides what evidence to disclose, and a court subsequently reviews that decision to determine whether it comports with the defendant's due process rights. And, while certainly a defendant has a right to effective assistance of counsel, to present a complete defense, and to conduct an effective cross-examination, those rights do not equate to a constitutional right to discovery--or that is, a right to compel the prosecution to disclose all *relevant* information in its files. *See Washington*, ¶ 17, 261 P.3d at 722.

[¶53] Finally, we also reject Kovach's argument that we must review the prosecution's suppression of evidence using a strict scrutiny analysis. Kovach has cited no authority that a prosecutor is exercising the State's police power when he decides what evidence to disclose to the defense, and the proposed analysis is entirely at odds with the above-discussed manner in which this Court has historically analyzed discovery and suppression issues.

[¶54] Kovach has not demonstrated an independent state constitutional basis for evaluating the prosecutor's failure to disclose the Issac Zimmerman e-mail, the prosecutor's conversation with MW, or the Dave Huber interview. We therefore conclude, based on our Fourteenth Amendment review above, that the prosecutor's failure to disclose this evidence did not result in a violation of Kovach's due process rights.

## II.    Disclosure Orders and Sanctions

[¶55] In Kovach's next assignment of error, Kovach contends that the district court erred both in ordering Kovach to disclose statements for witnesses not listed as defense witnesses and in the sanctions the court imposed for Kovach's violation of that disclosure order. Kovach alleges that the disclosure order and the sanctions violated the Rules of Criminal Procedure and infringed on his constitutional protections. With regard to Kovach's constitutional challenge to the pretrial disclosure order, we conclude that Kovach presented the district court with an insufficient factual basis to evaluate this claim, and we therefore affirm the court's rejection of that claim. With regard to the

alleged procedural violations, we agree that the court erred in requiring Kovach to disclose statements of witnesses not listed as witnesses for the defense and in imposing an evidentiary sanction outside the sanctions identified in W.R.Cr. P. 26.2. We conclude, however, that the error was harmless and therefore find no reversible error in the orders.

## A.    Background

[¶56]  On December 29, 2010, shortly after filing its charges against Kovach, the State filed a motion for production of witness statements in defendant's possession. Kovach objected to the State's request, contending such statements were protected by the attorney work product doctrine, that their production would violate Kovach's right against self incrimination, and that the statements were not discoverable under W.R.Cr.P. 16. On October 17, 2011, the district court held a motions hearing during which it addressed, among other pretrial issues, Kovach's objection to producing witness statements. During that hearing, the court invited Kovach's counsel to submit the witness statements for an *in camera* review to determine whether the statements revealed attorney work product or could be construed as self incriminating, and whether portions of the statements should be redacted before disclosure.

[¶57]  Kovach did not submit the disputed witness statements to the district court for an *in camera* review, and on November 14, 2011, the court, pursuant to W.R.Cr.P. 26.2, issued an order requiring that Kovach produce the requested witness statements by December 16, 2011, which was ten days before trial. On December 1, 2011, Kovach filed an Expedited Motion to Stay Proceedings Pending Filing and Resolution of Petition for Writ of Mandamus. In that motion, Kovach objected to the district court's order to produce witness statements, stating:

> 3.    Defendant believes that the order violates his constitutional right to counsel and is in violation of the Wyoming Criminal Rules of Procedure, specifically, Rule 16.
>
> 4.    If Defendant's counsel produces the statements, then Defendant does not have a remedy on appeal as the bell cannot be un-rung in this matter.
>
> 5.    Defendant's rights involved in this issue go to the heart of our legal process and the rights outlined in the Wyoming and United States Constitutions.
>
> 6.    Defendant requests that the proceedings be stayed pending the filing and resolution of a Petition for Writ of Mandamus (now referred to as a writ of review) with the Wyoming Supreme Court.

22

[¶58] On December 2, 2011, Kovach provided notice to the district court that he was electing not to comply with the court's order to produce witness statements, with the exception of the statement of Isaac Zimmerman. Kovach further informed the court that he had elected to accept a mandatory sanction under W.R.Cr.P. 26.2 of not being permitted to call in his case in chief the witnesses whose statements he refused to disclose. On that same date, the court held a hearing on Kovach's motion to stay proceedings, during which the court commented:

> I've received a notice from the Defendant today that the Defendant elects not to comply with that order to deliver those statements except for Isaac Zimmerman, I did review that briefly before I came into court just the first part is what I reviewed, frankly I haven't devoted a lot of time or attention to it. It appears to me that the Defendant has taken a position that the exclusive and mandatory sanctions are those that are provided in Rule 26.2. I do not agree with that, but I'm not going to make that decision at this point because we haven't hit December 16th yet. If we hit December 16th and those statements are not produced then you're going to require me to take a position and I would point out that you carefully exam[ine] Rule 42 of the Wyoming Rules of Criminal Procedure and the consequences that can come under Rule 42 and Rule 42.1 because I don't know that I agree that Rule 26.2 provides for the exclusive sanctions for failure to produce statements.
>
> . . . .
>
> What I think would be consistent, and I'd have to devote some research and thought to this, is to limit the ability of a defendant to cross-examine one of these witnesses, without turning over the statements as I've ordered, to only that testimony raised on direct-examination by the State, in other words, you can't come in with new, new information based upon statements that you know about that you refused to produce and you didn't give the State notice about that in time. I may consider and I will research my ability to do that as a potential reason to limit the scope of examination by counsel for the Defendant.

[¶59] On December 5, 2011, Kovach filed in the Wyoming Supreme Court a Petition for Writ of Review. Through that petition, Kovach requested that this Court either vacate the district court's order requiring defendant's disclosure of witness statements, or in the alternative, order that the remedies for Kovach's non-compliance are limited to those set

23

forth in Rule 26.2. On December 16, 2011, this Court issued an order denying Kovach's petition for writ of review.

[¶60] Although the record does not show when it happened or in what form the district court issued its order, at some point after December 16th and before trial, the court responded to Kovach's failure to comply with its disclosure order. The court apparently rejected Kovach's self-prescribed sanction and instead imposed the sanction it referenced in the earlier hearing, ordering that for those witnesses for whom Kovach had refused to provide statements, Kovach's cross-examination would be limited to the scope of the State's direct examination. Not only does the record not contain an order imposing the sanction, it also does not reflect an objection by Kovach to the sanction. This Court's knowledge of the sanction and Kovach's response to the sanction is limited to the exchanges during trial related to Kovach's cross-examination of two witnesses for whom he had refused to disclose witness statements, MW and Dan Frear.

[¶61] During MW's testimony, the following transpired:

> COURT: Cross-Examination.
> [Defense Counsel]: Thank you, your Honor.
> COURT: Based on Rule 26.2(e), [Defense Counsel], you're limited to strictly the scope of Direct, that's of the Wyoming Rules of Criminal Procedure.
> [Bench Conference]
> [Prosecutor]: Your Honor, I would also ask that [Defense Counsel] be precluded from using any statements that he refused to produce for impeachment purposes with [MW].
> COURT: [Defense Counsel], your position about that?
> [Defense Counsel]: No objection.
> COURT: Motion granted.
> . . . .
> Q. Is it safe to say as you were standing there, … , that you related to Jesse (sic) Ribelin?
> A. Yes.
> Q. And is that because of your personal experiences?
> [Prosecutor]: Your Honor, I'm going to object to this line of questioning.
> COURT: Sustained.
> [Defense Counsel]: It goes to state of mind, your Honor.

24

COURT: She also said that she related, it's sustained. You got her state of mind.

Q. Were you a victim of a violent attack?

COURT: This is irrelevant.

[Defense Counsel]: Your Honor, can I make an offer of proof, please?

COURT: Over at the bench.

[Bench Conference]

[Defense Counsel]: [Prosecutor] has asked about -- insinuated that she is lying about what she has done, that she is on Mr. Kovach's side because of her relationship with Mr. Kovach, I think that I have a right to at least explore what her state of mind is.

COURT: What's your offer of proof?

[Defense Counsel]: Your Honor, the witness's experience in this regard is crucial. The witness was subjected to a brutal attack that she had experienced, that's why she used the word attacked. When people are exposed to horrific situations, those experiences shape their perceptions. Her own experience in that regard is what prompted the use of the word attack and it goes directly to her state of mind, your Honor, and I should be able to explore that, this is Cross-Examination.

COURT: If you would have turned over the statements it would be. Denied.

[¶62] Dan Frear testified just after MW. During Mr. Frear's testimony, the district court issued the same admonition concerning defense counsel's cross-examination, after which defense counsel cross examined Mr. Frear regarding his testimony that Kovach may have told him he had fired his gun during his altercation with the Ribelins:

COURT: Cross-Examination. Again, pursuant to Rule 26.2(e) of the Wyoming Rules of Criminal Procedure you're limited to Cross-Examination only within the scope of Direct Examination.

[Defense Counsel]: Thank you, your Honor.

. . . .

Q. Mr. Frear, you said you don't recall exactly the conversation you had with Mr. Kovach; is that right?

A. Correct.

Q. And why don't you exactly remember that conversation?

A. One is over a year ago and there was quite amounts of alcohol drinking.

25

> Q.     You had been drinking all day, right?
> A.     Yes, sir.
> Q.     Do you remember even how much you had been drinking?
> COURT:     This is beyond the scope of Direct, ask a different question.
> [Defense Counsel]: Your Honor, I have nothing further.

[¶63]  On January 20, 2012, Kovach filed a motion for new trial in which he contended he was entitled to a new trial based on the alleged *Brady* violations and because the district court abused its discretion under Rule 26.2 by limiting defense counsel's cross-examination of MW and Dan Frear.  With respect to the discovery sanctions, Kovach's argument was one sentence which argued that the district court abused its discretion under Rule 26.2.  On February 21, 2012, Kovach filed a reply in support of his new trial motion in which he pointed out that the State had not responded to his Rule 26.2 argument, and then for the first time, he asserted that the district court's limitations on his cross-examination also violated his constitutional rights to effective assistance of counsel and effective cross-examination.

[¶64]  The district court denied Kovach's motion for a new trial on the ground that Kovach had failed to show how the limitations on his cross-examination denied him a fair trial.  On appeal, Kovach presents several arguments relating to, first, the district court's order requiring Kovach to produce witness statements, and second, the court's sanction for Kovach's failure to comply with its disclosure order.  With respect to the order requiring disclosure of the witness statements, Kovach argues that the required disclosure violated his constitutional right to effective assistance of counsel in that the disclosure would interfere with counsel's ability to make reasonable investigations.   He further argues that the district court misconstrued the requirements of Rule 26.2 and ordered a disclosure that violated Rule 16.  With respect to the court's sanction for violation of the disclosure order, Kovach argues that the court exceeded its authority under Rule 26.2 and that the sanction violated his constitutional rights to effective assistance of counsel and effective cross-examination.

## B.     Disclosure Order: Impact on Constitutional Rights

[¶65]  We address first Kovach's argument that the district court's order requiring the defense to make a pretrial disclosure of witness statements violated his constitutional rights.  Kovach initially objected to the State's request for the statements on the ground that such a disclosure would violate his privilege against self incrimination and would require disclosure of attorney work product.  After the district court later ordered that Kovach disclose the witness statements for trial, Kovach again objected, arguing generally that the required disclosure violated his constitutional right to counsel.  On

appeal, Kovach has expanded his argument and contends that the required disclosure was improper because it would violate his right to effective assistance of counsel by undermining his attorney's ability to conduct a reasonable investigation. Although Kovach's constitutional argument has been something of a moving target, our more fundamental concern is that the argument lacks a factual basis to allow for its consideration.

[¶66]  Kovach cites no authority for the proposition that requiring a criminal defendant to make a pretrial disclosure of witness statements is a per se violation of that defendant's right to effective assistance of counsel. Nor has Kovach provided a factual record to demonstrate how the specific witness statements at issue in this case would have revealed information that intruded on the attorney client relationship or otherwise interfered with counsel's effectiveness. From this Court's own research, we are unable to discern a bright line rule governing the constitutionality of ordering pretrial disclosures by a criminal defendant. As will be discussed hereinafter, the constitutional questions relating to pretrial discovery against a criminal defendant are instead largely fact sensitive, depending for their resolution upon the circumstances surrounding the required disclosure and the information that the disclosure will reveal. It is for this reason that we ultimately affirm the district court's rejection of Kovach's constitutional challenge to the disclosure order. Kovach failed to provide the district court with a factual basis sufficient to allow that court to consider the alleged constitutional infringement, and this Court is likewise without any basis on which to judge the alleged infringement.

[¶67]  To begin our discussion, we briefly outline in general terms the constitutional questions that may arise when allowing pretrial discovery against a criminal defendant. We do not intend this to be an exhaustive summary of these questions, or to suggest how this Court would rule when presented with a properly framed challenge to a disclosure order. Rather, we wish simply to illustrate that the constitutional questions relating to pretrial discovery against a criminal defendant are largely fact sensitive, depending for their resolution upon the circumstances surrounding the required disclosure or discovery and the information that the disclosure or discovery will reveal.

[¶68]  We turn first to the U.S. Supreme Court's decision in *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). In that case, the Supreme Court addressed the constitutionality of a Florida rule requiring a defendant to provide pretrial notice of any alibi defense. In upholding the rule, the Court recognized "the ease with which an alibi can be fabricated" and "the State's interest in protecting itself against an eleventh-hour defense." *Id*., 399 U.S. at 81, 90 S.Ct. at 1896. The Court then concluded:

> In the case before us, the notice-of-alibi rule by itself in no way affected petitioner's crucial decision to call alibi witnesses or added to the legitimate pressures leading to that course of action. At most, the rule only compelled petitioner

27

to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that the petitioner from the beginning planned to divulge at trial. Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense, any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself.

Petitioner concedes that absent the notice-of-alibi rule the Constitution would raise no bar to the court's granting the State a continuance at trial on the ground of surprise as soon as the alibi witness is called. Nor would there be self-incrimination problems if, during that continuance, the State was permitted to do precisely what it did here prior to trial: take the deposition of the witness and find rebuttal evidence. But if so utilizing a continuance is permissible under the Fifth and Fourteenth Amendments, then surely the same result may be accomplished through pretrial discovery, as it was here, avoiding the necessity of a disrupted trial. We decline to hold that the privilege against compulsory self-incrimination guarantees the defendant the right to surprise the State with an alibi defense.

*Williams*, 399 U.S. at 85-86, 90 S.Ct. at 1898 (footnotes omitted).

[¶69]  Three years later, the U.S. Supreme Court decided *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973).  In *Wardius*, the Court ruled Oregon's alibi notice rule unconstitutional, holding that "the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." *Id*., 412 U.S. at 472, 93 S.Ct. at 2211.  In so holding, the Court did not retreat from its holding in *Williams*.  It reasoned:

Notice-of-alibi rules, now in use in a large and growing number of States, are based on the proposition that the ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial.  … The growth of such discovery devices is a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system. As we recognized in *Williams*, nothing in the Due Process Clause

precludes States from experimenting with systems of broad discovery designed to achieve these goals. 'The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as 'due process' is concerned, for (a rule) which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence.' 399 U.S., at 82 (footnote omitted), 90 S.Ct., at 1896.

Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, … it does speak to the balance of forces between the accused and his accuser. …

…[I]n the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.

*Wardius*, 412 U.S. at 474-76, 93 S.Ct. at 2211-13 (footnotes and citations omitted).

[¶70]  In 1975, the U.S. Supreme Court decided *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).  At issue in *Nobles* was disclosure of a defense investigator's report containing statements taken from prosecution witnesses.  *Id.*, 422 U.S. at 227, 95 S.Ct. at 2164.  The trial court did not order a pretrial disclosure of the report, but it did order that it would examine the report *in camera*, would excise all reference to matters not relevant to the precise statements at issue, and would order disclosure if the investigator testified as to the witness interviews and statements.  *Id.*, 422 U.S. at 229, 95 S.Ct. at 2165.  After defense counsel stated that he would not comply with such a disclosure order, the trial court barred the investigator from testifying about the witness interviews.  *Id.*  The Court upheld the trial court's order, explaining:

It was  …  apparent to the trial judge that the investigator's report was highly relevant to the critical issue of credibility. In this context, production of the report might

29

substantially enhance 'the search for truth,'    *Williams v. Florida,* 399 U.S., at 82, 90 S.Ct., at 1896. We must determine whether compelling its production was precluded by some privilege available to the defense in the circumstances of this case.

. . . .

The Court of Appeals concluded that the Fifth Amendment renders criminal discovery 'basically a one-way street.' 501 F.2d at 154. Like many generalizations in constitutional law, this one is too broad. The relationship between the accused's Fifth Amendment rights and the prosecution's ability to discover materials at trial must be identified in a more discriminating manner.

The Fifth Amendment privilege against compulsory self-incrimination is an 'intimate and personal one,' which protects 'a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation.' … As we noted in *Couch*, *supra*, 409 U.S., at 328, 93 S.Ct., at 616, the 'privilege is a personal privilege: it adheres basically to the person, not to information that may incriminate him.'

In this instance disclosure of the relevant portions of the defense investigator's report would not impinge on the fundamental values protected by the Fifth Amendment. The court's order was limited to statements allegedly made by third parties who were available as witnesses to both the prosecution and the defense. Respondent did not prepare the report, and there is no suggestion that the portions subject to the disclosure order reflected any information that he conveyed to the investigator. The fact that these statements of third parties were elicited by a defense investigator on respondent's behalf does not convert them into respondent's personal communications. Requiring their production from the investigator therefore would not in any sense compel respondent to be a witness against himself or extort communications from him.

We thus conclude that the Fifth Amendment privilege against compulsory self-incrimination, being personal to the defendant, does not extend to the testimony or statements of

30

third parties called as witnesses at trial. The Court of Appeals' reliance on this constitutional guarantee as a bar to the disclosure here ordered was misplaced.

*Nobles*, 422 U.S. at 232-234, 95 S.Ct. at 2167-2168 (footnotes and citations omitted).

[¶71]  The final U.S. Supreme Court case we include in our discussion is *Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).  In *Taylor*, a trial court, as a sanction against a criminal defendant for failing to identify a witness in response to a pretrial discovery request, refused to allow the undisclosed witness to testify.  *Id.*, 484 U.S. at 402, 108 S.Ct. at 650.  The Court held that such a sanction was not absolutely prohibited by the Compulsory Process Clause of the Sixth Amendment and found no constitutional error on the specific facts of the case.  *Id*.  In upholding the sanction, the Court observed the need for discovery in criminal proceedings:

> The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony. Neither may insist on the right to interrupt the opposing party's case, and obviously there is no absolute right to interrupt the deliberations of the jury to present newly discovered evidence. The State's interest in the orderly conduct of a  criminal  trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

> The defendant's right to compulsory process is itself designed to vindicate the principle that the "ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts."  …  Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose.  Discovery, like cross-examination, minimizes the risk that a  judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony. The "State's interest in protecting itself against an eleventh-hour defense" is merely one component

31

of the broader public interest in a full and truthful disclosure of critical facts.

*Taylor*, 484 U.S. at 410-12, 108 S.Ct. at 654 (footnotes and citations omitted).

[¶72]   In *Taylor*, the Supreme Court explained that, although the Sixth Amendment right to present a defense is fundamental, it is not absolute if outweighed by countervailing public interests.  *Taylor*, 484 U.S. at 414, 108 S.Ct. at 656.  The Court offered several non-exclusive factors to be considered in determining whether a sanction against a defendant for a pretrial discovery violation will impermissibly infringe on a defendant's Sixth Amendment rights:

> The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.
>
> A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony.

*Taylor*, 484 U.S. at 414-15, 108 S.Ct. at 656 (footnotes and citations omitted); *see also Gruwell v. State*, 2011 WY 67, ¶¶ 11-17, 254 P.3d 223, 227-29 (Wyo. 2011); *Breazeale v. State*, 2011 WY 10, ¶¶ 33-35, 245 P.3d 834, 843-44 (Wyo. 2011); *Dysthe v. State*, 2003 WY 20, ¶¶ 5-9, 63 P.3d 875, 878-81 (Wyo. 2003); *Lawson v. State*, 994 P.2d 943, 946-47 (Wyo. 2000) (Wyoming cases applying *Taylor* factors to exclusion of evidence as sanction for defense pretrial notice violations).

[¶73] What the Supreme Court's rulings in *Williams*, *Wardius*, *Nobles*, and *Taylor* instruct, and what is implicit in this Court's above-cited rulings, is that there is no absolute constitutional bar to requiring pretrial discovery or a pretrial disclosure from a criminal defendant.  Indeed, the limits on such pretrial disclosures remain the subject of much debate among scholars.

Does the accelerated disclosure doctrine of *Williams* take into

account the potential for such disclosure being utilized by the prosecution to obtain evidence of the formative elements of the crime that would not have been obtained if disclosure was required only after the prosecution established a prima facie case? Commentators taking a narrow view of *Williams* argue that it does not and that the Court would distinguish *Williams* if fairly faced with such a case. *Williams*, they note, simply did not present a situation in which pretrial disclosure would "accelerate" a choice that would otherwise never have to be made because the prosecution, without leads provided by the disclosure, would not have established a prima facie case in its case-in-chief. Indeed, they argue, the facts there clearly negated such a possibility. In describing the prosecution's use of the alibi disclosure, the Court noted that the prosecution had responded by laying the groundwork for impeaching the alibi witness and establishing by independent evidence the falseness of her testimony. Although Justice Black in dissent raised the possibility that an accelerated disclosure might be used directly or derivatively to enhance the strength of the prosecution's case-in-chief, there was no suggestion in the facts presented by the majority that such had been the case and, indeed, no such claim had been made by the defendant. Moreover, the very nature of an alibi defense, the commentators note, made such use largely unlikely. Alibi witnesses, as persons who were elsewhere, are not likely to be helpful sources to the prosecution in proving the elements of the offense. While they conceivably could have some relevant information on that score in unusual cases, that possibility as a general matter falls far below the requirement of a "real and appreciable danger" the standard commonly used in determining whether the likelihood of incrimination is sufficient to raise a legitimate self-incrimination claim. The likelihood would be far greater, the commentators note, as to other types of defense witnesses, particularly those who would be present at the scene (as in the case of witnesses supporting a claim of self-defense). Where a pretrial discovery rule would require disclosure of the identity of such witnesses, the Court might be far less willing to accept the disclosure requirement by drawing an analogy between the pretrial and the trial choice to disclosure. At the least, it is argued, the Court might hold that pretrial discovery could not be ordered where the defense can establish in camera that there exists a real and appreciable danger that the disclosure

could be used by the prosecution in developing its case-in-chief. Arguably disclosure also would not be required where the defense could make a showing in camera that the disclosure would be incriminating with respect to some unrelated offense. Here too, the defense would not be required to decide whether the disclosure is worth the risk until it is clear that the prosecution can meet its burden of establishing its case-in-chief.

Other commentators contend that there is no limitation to the Court's acceptance of the accelerated disclosure concept in *Williams*. The *Williams* ruling demands at most that the defense be given broad discovery of the prosecution's case, as was true in Florida, so it can make a reasoned tactical judgment as it would at trial.

5 Wayne R. LaFave, et al., *Criminal Procedure* § 20.4(d) (3d ed. 2012) (footnotes omitted); *see also* Allis, *Limitations on Prosecutorial Discovery of the Defense Case in Federal Courts: The Shield of Confidentiality*, 50 S. Cal. L. Rev. 461 (1977); Blumenson, *Constitutional Limitations on Prosecutorial Discovery*, 18 Harv.Civ.R.-Civ.L. L.Rev. 122 (1983); Clinton, *The Right to Present a Defense*, 9 Ind. L. Rev. 713 (1976); Mosteller, *Discovery Against the Defense: Tilting the Adversarial Balance*, 74 Cal. L. Rev. 1567 (1986); Tomlinson, *Constitutional Limits on Prosecutorial Discovery*, 23 San Diego L. Rev. 923 (1986); Van Kessel, *Prosecutorial Discovery and the Privilege Against Self-Incrimination: Accommodation or Capitulation*, 4 Hast.L.Q. 855 (1977); Westen, *Order of Proof: An Accused's Right to Control the Timing and Sequence of Evidence in His Defense*, 66 Cal. L. Rev. 935 (1978).

[¶74] What is apparent from the cases cited and from the continuing debate over pretrial discovery and disclosures against a criminal defendant is that whether such a pretrial requirement raises a constitutional issue depends upon the circumstances surrounding the requirement and the information that will be disclosed. While the above-cited cases and authorities do not discuss pretrial disclosures in terms of interfering with the right to counsel, which was the particular right Kovach asserted in refusing disclosure in this case, our precedent shows that a claimed infringement on the right to counsel is likewise a fact-specific inquiry. *See Trusky v. State*, 7 P.3d 5, 9 (Wyo. 2000) (observing that required pretrial disclosure of defense expert's notes is not an impermissible intrusion into attorney-client relationship in absence of a showing of substantial prejudice, *e.g.*, disclosure "of confidential information pertaining to the defense plans and strategy, from government influence which destroys the defendant's confidence in his attorney, and from other actions designed to give the prosecution an unfair advantage at trial").

[¶75]  This Court has consistently held that trial courts have broad discretion over pretrial matters and discovery.  *See Schreibvogel v. State*, 2010 WY 45, ¶ 12, 228 P.3d 874, 880 (Wyo. 2010); *Ceja v. State*, 2009 WY 71, ¶ 11, 208 P.3d 66, 68; *Trusky*, 7 P.3d at 11.  In exercising that discretion over pretrial disclosure requests or orders, and in considering a defendant's constitutional challenge to such requests or orders, a trial court, given the fact sensitive nature of such challenges, must necessarily consider the factual circumstances of the request and the information that will be revealed by the disclosure.  To that end, the district court in this case invited Kovach to submit the relevant witness statements for an *in camera* review.  For reasons not disclosed by the record, Kovach did not submit the statements.  The trial court therefore had no basis for evaluating whether requiring disclosure of the disputed witness statements would infringe on any of Kovach's cited constitutional rights, and this Court is left in the same position.  As we explained in a similar case:

> We do not need to address whether the notes fall under the rubric of W.R.Cr.P. 16(b)(1)(B) and W.R.Cr.P. 26.2(a) because the record does not include a copy of the report or the notes. Without copies of the report or the notes in question, we are unable to determine whether the trial court abused its discretion in Wendy's case. The appellant has the burden to prove abuse of discretion and the burden to provide an adequate record on appeal. *Clark v. Alexander*, 953 P.2d 145, 150 (Wyo. 1998); *Stadtfeld v. Stadtfeld*, 920 P.2d 662, 664 (Wyo. 1996). Given Wendy's failure to provide us with a copy of the social worker's notes or the report, we have no choice but to affirm the trial court's decision to allow discovery of the notes pursuant to the relevant rules of criminal procedure.

*Trusky*, 7 P.3d at 11.

[¶76]  Kovach did not provide the district court a sufficient factual basis on which to evaluate his constitutional challenge to the court's disclosure order, and this Court is likewise left with no record on which we are able to evaluate the alleged infringement. We thus affirm the district court's rejection of Kovach's constitutional challenge to the court's pretrial disclosure order.

## C.    Kovach's Remaining Challenges to Disclosure and Sanctions Order

[¶77]  We turn next to Kovach's argument that the district court's pretrial disclosure and sanction orders contravened Rules 26.2 and 16 of the Wyoming Rules of Criminal Procedure and Kovach's Sixth Amendment confrontation rights.   With respect to Kovach's Rule 26.2 and Rule 16 objections to the disclosure order, Kovach preserved

this issue for appeal with his objections to the State's discovery request and his reassertion of those objections in his formal election to not comply with the ordered disclosure. Although we generally review a court's orders governing discovery or trial procedures for an abuse of discretion, the question presented by Kovach is one of rule interpretation, which we review *de novo*. *See Kelly v. Kilts*, 2010 WY 151, ¶ 9, 243 P.3d 947, 950 (Wyo. 2010) (citing *Busch v. Horton Automatics, Inc.*, 2008 WY 140, ¶ 13, 196 P.3d 787, 790 (Wyo.2008)) ("The interpretation of rules, like the interpretation of statutes, involves a question of law which we review *de novo*.").

[¶78] With respect to Kovach's argument that the sanction exceeded the sanctions permitted by Rule 26.2, as well as his argument that the sanction violated his Sixth Amendment confrontation rights, the record is less clear as to Kovach's preservation of these issues for appeal. These arguments relate to the restrictions the district court placed on Kovach's cross-examination of MW and Dan Frear, and as we indicated in our background discussion of the disclosure order and sanctions, Kovach's first objection to the court's sanction order does not appear in the record until Kovach's new trial motion. His constitutional objection does not make an appearance until his reply in support of the new trial motion. Indeed, during trial, when the court reminded Kovach of the limits on his cross-examination, Kovach did not object to the sanctions and even stated he had no objection.[1]

[¶79] Under these circumstances, our analysis is appropriately confined to a review for plain error. *See Causey v. State*, 2009 WY 111, ¶ 17, 215 P.3d 287, 293 (Wyo. 2009) (objection not properly preserved on appeal unless particular objection made at trial); *see also* 23A C.J.S. *Criminal Law* § 1930 (2012) ("Where a party fails to properly object to a matter at trial, that party may not object for the first time in a motion for a new trial. A defendant's motion for a new trial will be denied if he or she fails to raise an issue during trial, including a constitutional issue.") (footnotes omitted). Our plain error analysis subjects a claim of error to the following review:

> To show plain error, an appellant "must establish, by reference to the record, a violation of a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way and that the violation adversely affected a substantial right resulting in material prejudice." *Jealous v. State*, 2011 WY 171, ¶ 11, 267 P.3d 1101, 1104 (Wyo. 2011) (citing *Cazier v. State*, 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo. 2006)). To establish material prejudice, an appellant "must show a reasonable possibility exists that he would have received a

---

[1] Although Kovach made an offer of proof with respect to the testimony of MW, he did not object on the record to the court's discovery sanction as an abuse of discretion or as an infringement on his constitutional rights.

more favorable verdict in the absence of the errors." *Jealous*, ¶ 11, 267 P.3d at 1104 (citing *Pendleton v. State*, 2008 WY 36, ¶ 11, 180 P.3d 212, 216 (Wyo. 2008)).

*Joreski v. State*, 2012 WY 143, ¶ 11, 288 P.3d 413, 416 (Wyo. 2012).

## 1. Disclosure Obligations and Limitations under Rules 16 and 26.2

[¶80]  This Court interprets rules of procedure using our usual rules of statutory construction:

> Our initial effort is directed at ascertaining if a statute or procedural rule is ambiguous. If it is not, we apply the plain language of the statutes and/or rules. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed, according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute in *pari materia*.

*Busch*, ¶ 13, 196 P.3d at 790 (citing *Cotton v. McCulloh*, 2005 WY 159, ¶ 14, 125 P.3d 252, 258 (Wyo. 2005)).

[¶81]  Kovach first argues that if Rule 26.2 is interpreted to allow a court to order disclosure of witness statements held by the defense, the rule will conflict with Rule 16's limitations on a defendant's disclosure obligations.  We disagree.

[¶82]  Rule 16 allows for the discovery of information from both the State and the defendant, subject to the following limitations on the information available from the defendant:

> (2) *Information Not Subject to Disclosure.*  Except as to scientific or medical reports, this subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or the defendant's attorneys or agents in connection with the investigation or defense of the case, or of statements made by the defendant, or by state or defense witnesses, or by prospective state or defense witnesses, to the defendant, the defendant's agents or attorneys.

W.R.Cr. P. 16(b)(2).

[¶83]   We reject Kovach's argument that this Rule 16 language bars a trial court from ordering a defendant to make a pretrial disclosure of witness statements.  Kovach's argument fails because it ignores that Rules 16 and 26.2 serve different functions and come into play at different stages of the criminal proceedings.  Rule 16 is a discovery rule and limits the information a defendant is required to disclose during discovery.  Rule 26.2, on the other hand, governs the district court's authority to order production for trial. *See State v. Naple*, 2006 WY 125, ¶ 12, 143 P.3d 358, 361 (Wyo. 2006) (Wyo. R. Crim. P. 16 modeled after federal Rule 16); *United States v. Nobles*, 422 U.S. 225, 234-36, 95 S.Ct. 2160, 2168-69 (1975) (Rule 16 governs pretrial disclosure and was not intended to constrict trial court's control over trial).  When the two rules are read in the context of the respective stages they govern, they can be reconciled.  Rule 16 precludes discovery of the statements at an earlier point in the criminal proceedings, but Rule 26.2 gives the trial court discretion to order disclosure for trial at some point before trial.

[¶84]   Alternatively, if we were to accept Kovach's argument, Rule 16's limitation on disclosure would directly contradict and nullify the Rule 26.2 language authorizing a court to order the defense to produce witness statements for trial.  *See* Rule 26.2(a) ("Upon order of the court, the attorney for the state or the defendant and the defendant's attorney shall produce . . . .").  We must, and do, choose the interpretation of Rules 26.2 and 16 that allows the rules to be harmonized and avoids nullifying the operation of either rule.  *See Redco Const. v. Profile Props., LLC*, 2012 WY 24, ¶ 26, 271 P.3d 408, 416 (Wyo. 2012) ("[W]e must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation.").

[¶85]   The plain language of Rule 26.2(a)(2) authorizes a court to order both the defense and prosecution to produce witness statements for trial, and we find no violation of Rule 16 in the district court's order doing so in this case.  In so ruling, however, we caution that our finding of no Rule 16 violation is based on the facts of this case.  Here, although the State moved for production of the defense witness statements early in the case, just after filing its charges, the court did not order their production until ten days before trial.  In so ordering, the court reasoned that a pretrial disclosure would be less disruptive and time consuming than requiring production of statements during trial, after a witness' testimony.  In other words, the record clearly reflects that the ordered disclosure was a trial disclosure and not a discovery disclosure.

[¶86]   We emphasize that Rule 16 applies to discovery and Rule 26.2 applies to trial disclosures, meaning that an order requiring the defense to disclose witness statements must reflect, based on its timing and the circumstances of its issuance, that it is a trial order and not a discovery order.  Without this delineation, we could foresee the conflict between Rules 16 and 26.2 asserted by Kovach, as well as the potential constitutional implications we discussed above.

[¶87]  Kovach next argues that even if the district court's disclosure order did not violate Rule 16, the order did nonetheless exceed the court's authority under Rule 26.2. Specifically, Kovach argues that Rule 26.2 permits a court to order a pretrial disclosure of a witness statement only by the party calling that witness to testify.  With this argument, we agree.

[¶88]  In keeping with our rules of interpretation, we look first to the plain language of Rule 26.2, which authorizes a trial court to order disclosure of witness statements as follows:

> (a) *Order for Production.*  Upon order of the court, the attorney for the state or the defendant and the defendant's attorney shall produce for the examination and use of the other party, ***any written or recorded statement of a witness other than the defendant in their possession or which they may reasonably obtain and which relates to the subject matter about which the witness has testified or will testify*** and:
>
>> (1)  Upon demand of the other party, the court shall order the statement to be produced after a witness has testified; and
>>
>> (2) ***Upon motion of a party or upon its own motion, the court may require the statement to be produced at any time before trial.***

W.R.Cr.P. 26.2(a) (emphasis added).

[¶89]  Rule 26.2 authorizes a court to order either party to produce any witness statement in that party's possession that relates to the subject matter of the witness' testimony, and nothing in the above-quoted language limits that authority to statements in the possession of the party calling a witness on direct examination.  In keeping with our rules of interpretation, however, we must read all parts of Rule 26.2 together.  In that regard, because this Court has held that a trial court must consider the Rule 26.2 sanctions in response to a party's violation of a Rule 26.2 disclosure order, we find the rule's sanctions provision particularly relevant.  *See Seivewright v. State*, 7 P.3d 24, 28 (Wyo. 2000) (Rule 26.2 sanctions provision "mandatory in all respects").  Rule 26.2 provides the following sanctions:

> (e) *Failure to Comply With Order.* If a party elects not to comply with an order to deliver a statement, the court shall order:

> (1) That the witness not be permitted to testify; or
>
> (2) That the testimony of the witness be stricken from the record and that the trial proceed; or
>
> (3) If it is the attorney for the state who elects not to comply, shall declare a mistrial if required in the interest of justice.

W.R.Cr.P. 26.2(e).

[¶90] The first Rule 26.2 sanction, that the witness not be permitted to testify, contemplates a pretrial disclosure violation. That is, the trial court orders a pretrial disclosure, a party refuses or fails to comply, and the court responds by barring the witness from testifying. By its plain terms, this sanction would be effective only against a party proposing to call the witness in question--that is, if a party does not list a witness, that party is not going to be affected by an order barring the witness from testifying. The second sanction, because it calls for the striking of testimony already given, contemplates an order to disclose after the witness has testified. By its terms, the sanction would be effective against either the party who called the witness, or the party who cross-examined the witness, assuming that the cross-examining party used a witness statement in its cross-examination and refused to disclose that statement after being so ordered. The third sanction relates only to prosecution violations, and by its terms, likewise contemplates violation of an order to produce a witness statement after the witness has testified.

[¶91] Of the Rule 26.2 authorized sanctions, only the first sanction relates to a pretrial disclosure. Because that sanction applies only to a disclosure violation by the party calling a witness, we are persuaded that the Rule 26.2(a)(2) language permitting a court to order a pretrial disclosure permits such an order only against the party calling the witness. Otherwise we would be forced to conclude that Rule 26.2 authorizes a pretrial disclosure order without at the same time authorizing a concomitant sanction, a result that would be at odds with the importance this Court has previously attached to the sanctions provision.

[¶92] Based on this interpretation of Rule 26.2, we must conclude that the district court erred in ordering Kovach to make a pretrial disclosure of witness statements for witnesses not listed by Kovach. With respect to this error, however, the only prejudice that Kovach alleges is the impact from the district court's sanction order entered in response to Kovach's refusal to comply with the disclosure order. We thus turn to Kovach's arguments relating to the court's sanction order.

2.      **Sanctions Order: Rule 26.2 and Sixth Amendment**

40

[¶93] Kovach contends that the district court's sanctions order, which limited his cross-examination of those witnesses for which he refused to disclose witness statements, exceeded the court's authority under Rule 26.2 and infringed on his constitutional right to confront witnesses against him. As indicated above, we review these claimed errors under our plain error analysis, which requires that: 1) the alleged error clearly appears in the record; 2) the error transgressed an unequivocal rule of law in a clear and obvious way; and 3) the error adversely affected a substantial right resulting in material prejudice to the defendant. *See Joreski*, ¶ 11, 288 P.3d at 416.

[¶94] We address first Kovach's argument that the sanctions order exceeded the district court's authority under Rule 26.2. As noted earlier, the record does not contain the district court's order imposing the discovery sanction, or the court's reasoning for its order. The record does, however, contain sufficient information to show the substance of the sanction, and the alleged error does therefore clearly appear in the record. As to the second prong of our plain error analysis, we agree with Kovach that the sanction transgressed an unequivocal rule of law. This Court has held that the Rule 26.2(e) is in all respects mandatory and that the sanctions identified in Rule 26.2(e) are the exclusive evidentiary sanctions that a court may impose for a party's failure to disclose a witness statement in violation of a Rule 26.2 order. *Seivewright*, 7 P.3d at 28 (rejecting sanctions order because allowing objections to particular questions at trial was "not one of the sanctions mandated by the rule"). Because limiting the cross-examination of witnesses is not one of the exclusionary sanctions authorized by Rule 26.2(e), we find that the district court erred in imposing the sanction.[2]

[¶95] We turn then to the third question in our plain error analysis--whether the error resulted in material prejudice to Kovach. The prejudice Kovach asserts is the violation of his Sixth Amendment right to confront witnesses against him. This dovetails with Kovach's constitutional challenge to the sanction order, and we thus consider the prejudice to Kovach in our discussion of the alleged constitutional violation that resulted from the disclosure sanction.

[¶96] As to the alleged constitutional violation, the record is again sufficient to establish the district court's sanction itself. With regard to the cross-examination of Dan Frear,

---

[2] We do not intend this holding to interfere with a trial court's obligation to exercise its discretion before excluding evidence as a sanction for a defendant's disclosure order violation. *See Gruwell*, ¶¶ 11-17, 254 P.3d at 227-29; *Breazeale*, ¶¶ 33-35, 245 P.3d at 843-44; *Dysthe*, ¶¶ 5-9, 63 P.3d at 878-81; *Lawson*, 994 P.2d at 946-47 (identifying factors a court must consider before excluding evidence as a sanction for a defense discovery or disclosure violation). While a trial court must, as we held in *Seivewright*, give consideration to the Rule 26.2(e) sanctions, the court need not exclude the evidence if it finds such a sanction would infringe on a defendant's Sixth Amendment right to present his case. Moreover, although the Rule 26.2(e) sanctions are the exclusive evidentiary sanctions a court may order in response to a failure to comply with a Rule 26.2 order, this holding does not restrict a court's discretion to take other non-exclusionary actions, such as ordering a continuance or imposing non-evidentiary contempt sanctions under W.R.Cr.P. 42 or 42.1.

however, Kovach made no offer of proof. In the absence of that offer of proof showing the testimony Kovach hoped to elicit, we have no means of determining whether there was a clear and obvious violation of an unequivocal law or whether that alleged violation resulted in material prejudice. We therefore find no plain error with respect to the court's sanction as it was used to restrict Kovach's cross-examination of Dan Frear.

[¶97] With respect to the alleged constitutional infringement resulting from the district court's restriction on Kovach's cross-examination of MW, Kovach did make an offer of proof establishing the testimony that Kovach was precluded from exploring as a result of the sanction. We turn then to the next prong of our plain error analysis and address whether Kovach has established a clear and obvious violation of his confrontation rights.

[¶98] This Court has explained the limitations a court may properly place on a defendant's cross-examination:

> .... In order for there to be a violation of the right of confrontation, a defendant must show more than just a denial of the ability to ask specific questions of a particular witness. Rather, a defendant must show that he was prohibited "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness ... 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Hannon*, ¶ 18, 84 P.3d at 330 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). The Confrontation Clause guarantees a defendant an "**opportunity** for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (*per curiam*) (emphasis in original)). A defendant's right to cross-examination of a witness is not unfettered, but is subject to the trial court's "discretion to reasonably limit cross-examination to prevent, among other things, questioning that is repetitive or of marginal relevance." *Hannon*, ¶ 22, 84 P.3d at 331–32 (quoting *United States v. DeSoto*, 950 F.2d 626, 629–30 (10th Cir. 1991)); see also *Olden v. Kentucky*, 488 U.S. 227, 232, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988) (*per curiam*).

*Downing v. State*, 2011 WY 113, ¶ 11, 259 P.3d 365, 368-69 (Wyo. 2011) (quoting *Miller v. State*, 2006 WY 17, ¶ 8, 127 P.3d 793, 796 (Wyo. 2006) (emphasis in original).

[¶99]   We have also explained the showing that must be made to support a Confrontation Clause violation:

> [T]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Downing*, ¶ 11, 259 P.3d at 368.

[¶100] With respect to the testimony of MW, Kovach contends that he should have been permitted to explore MW's history as a sexual assault victim.  He contends that this would have allowed him to show that it was her own history rather than anything in Kovach's conduct that caused her to use the term "attack" when describing what occurred between Kovach and the Ribelins.  Although Kovach's argument is less than clear, we assume it is the following testimony by MW that Kovach sought to address with his cross-examination:

> Q.    What did you tell the dispatcher as to how they received their injuries?
> A.    That they were attacked.
> Q.    Anything else?
> A.    (Shakes head.)
> Q.    Do you recall stating that a young man went off on them?
> A.    I don't recall actually saying that, but . . .
> Q.    Is that your impression of what occurred?
> A.    To me it was more of an altercation and I had just used the wrong words at that time because I don't know what happened up to there besides what the old men had told me at this point.
> Q.    Okay.  Do you recall telling me why you felt they had been attacked?

> A. Because Jesse had pulled fencing pliers on Travis.
>
> Q. Do you recall telling me what your impression was as to why you felt they were attacked?
>
> A. Because Jesse had pulled the fencing pliers.
>
> Q. Do you recall telling me that the old man didn't do anything, he didn't deserve to be attacked?
>
> A. In the camp, correct? Are you talking about the camp or up top?
>
> Q. I'm talking about in the camp.
>
> A. Okay. Then right, Jesse wasn't doing anything.
>
> Q. And isn't that the reason you used the word attacked?
>
> A. Yes.

[¶101] On cross-examination, defense counsel was permitted to elicit testimony that MW related to Jess Ribelin, but he was not permitted to explore her history as a sexual assault victim. Applying our Confrontation Clause analysis to this limitation on Kovach's cross-examination, we are unable to find a clear and obvious violation of his right to cross-examination.

[¶102] Our analysis requires that we assume the damaging potential of the cross-examination was fully realized and then consider the impact of that cross-examination on the prosecution's case. Doing so, it is simply inconceivable to this Court that the proffered cross-examination as to MW's use of the term "attack" would have had any measureable impact on the prosecution's case.

[¶103] First, regardless of how MW characterized Kovach's behavior, she testified as to what she witnessed after Kovach brought the Ribelins back to his hunting camp: Kovach shoved the Ribelins to the ground without provocation. Moreover, by the time MW testified: The jury had heard the testimony of the Ribelins as to how they were injured, along with the testimony of the attending physician regarding the seriousness of their injuries; the jury had viewed photographs of the injuries; the jury had heard the testimony of Isaac Zimmerman that at the hunting camp, Kovach knocked the Ribelins to the ground without provocation and that Kovach had gone "too far" and used "[m]ore force than was required for what went down;" and the jury had been presented with Kovach's recorded statement in which he used the terms "whipped his ass" when referring to what he did to one of the Ribelin brothers. Given the evidence before the jury, we can ascertain no discernible defensive gain from Kovach's proposed cross-examination of MW.

[¶104] Kovach has not shown a clear and obvious violation of his Confrontation Clause rights with respect to the district court's limitation on his cross-examination of MW.

MW's use of the word "attack" simply does not stand out from the other evidence presented to the jury showing that Kovach was the aggressor in the confrontation with the Ribelins, was not acting in self defense, and was not justified in the injuries he inflicted on the two men. We therefore find no plain error in the district court's discovery sanction.

## III.  Prosecutorial Misconduct

[¶105] Kovach contends that the prosecutor engaged in misconduct when he failed to correct false or misleading testimony by MW concerning promises the prosecution made to her to procure her favorable testimony and by Isaac Zimmerman concerning threats by the prosecution. Defense counsel did not object to this testimony during trial, and we therefore review the claim for plain error. *See Lawson*, ¶¶ 48-50, 242 P.3d at 1008 (plain error review of prosecutorial misconduct claim where plea agreement uncovered after trial). The testimony Kovach challenges as false or misleading is the same testimony we discussed in our analysis of Kovach's *Brady* claims, and for much the same reason we rejected the *Brady* claims, we likewise reject Kovach's prosecutorial misconduct claims.

[¶106] As indicated above, our plain error analysis requires that:  1)  The alleged error clearly appears in the record; 2) the error transgressed an unequivocal rule of law in a clear and obvious way; and 3) the error adversely affected a substantial right resulting in material prejudice to the defendant. *Lawson*, ¶ 48, 242 P.3d at 1008.

[¶107] The alleged false and misleading testimony clearly appears in the record, and this prong of the plain error test is therefore satisfied. We turn then to the second prong of our plain error analysis, the clear and obvious violation of an unequivocal rule of law. We have recognized that a due process violation results when a prosecutor elicits false or misleading testimony or allows the same to go uncorrected. *Lawson*, ¶ 50, 242 P.3d at 1008 (citing *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). The heart of this prong is of course a showing that the cited testimony was false or misleading, and in this case we find neither.

[¶108] With respect to MW's testimony that she was not promised anything by the prosecutor in exchange for favorable testimony, we addressed this alleged promise in our discussion of Kovach's *Brady* claim and found no such promise existed. Because no promise was made, MW's testimony was neither false nor misleading and required no correction by the prosecutor.

[¶109] We likewise addressed Isaac Zimmerman's testimony. Mr. Zimmerman testified on direct that he was threatened by the prosecutor's investigator, not the prosecutor. On cross-examination by the prosecutor, however, the prosecutor's first questions were directed at disclosing the numerous conversations he personally had with Mr. Zimmerman and that he had threatened to charge Mr. Zimmerman as an accessory. To

the extent there was anything misleading in Mr. Zimmerman's initial testimony, the prosecutor promptly corrected it. Moreover, as discussed earlier in the context of Kovach's *Brady* claims, Mr. Zimmerman's testimony was replete with discussions of threatened prosecution and pressure brought on him by the prosecutor. The jury was not misled concerning the threats of prosecution against Mr. Zimmerman.

[¶110] Kovach has not established that the prosecutor allowed false or misleading testimony to go uncorrected. We therefore reject his claim of prosecutorial misconduct.

## IV. Sentencing Errors

[¶111] Kovach asserts two errors in sentencing. First, he contends the district court erred in considering uncharged misconduct in sentencing. Second, he contends the court erred in *sua sponte* amending its judgment and sentence to increase the fines assessed against Kovach from a total of $6,000 to a total of $9,000. Kovach did not object below to the court's sentencing rationale or its amendment of its judgment, and we therefore review these claims for plain error. Again, this requires that we find: 1) the alleged error clearly appears in the record; 2) the error transgressed an unequivocal rule of law in a clear and obvious way; and 3) the error adversely affected a substantial right resulting in material prejudice to the defendant. *Lawson*, ¶ 48, 242 P.3d at 1008.

## A. Uncharged Misconduct

[¶112] Kovach contends that the district court erred in sentencing by considering previously excluded uncharged misconduct evidence related to an incident between Kovach and a neighbor. While the record clearly reflects the court's reference to the uncharged misconduct, Kovach has not established that the court violated an unequivocal rule of law in its sentencing, and we thus reject this claimed error.

[¶113] Because this issue presents a challenge to the court's sentencing decision, we are guided by the following in applying our plain error analysis:

> We review a district court's sentencing decisions for abuse of discretion. *Roeschlein v. State*, 2007 WY 156, ¶ 17, 168 P.3d 468, 473 (Wyo. 2007). A sentence will not be disturbed because of sentencing procedures unless the defendant can show an abuse of discretion, procedural conduct prejudicial to him, circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play. *Id.* An error warrants reversal only when it is prejudicial and it affects an appellant's substantial rights. *Id.* The party who is appealing bears the burden to establish that an error was prejudicial. *Id.*

*Joreski*, ¶ 10, 288 P.3d at 416 (quoting *Noller v. State*, 2010 WY 30, ¶ 7, 226 P.3d 867, 869 (Wyo. 2010)).

[¶114] A sentencing court may consider a wide range of factors about the defendant and the crime when imposing sentence. *Joreski*, ¶ 11, 288 P.3d at 416.

> They are free, in the exercise of their sentencing discretion, to consider victim impact statements, PSIs and other factors relating to the defendant and his crimes in imposing an appropriate sentence within the statutory range. *Garcia v. State*, 2007 WY 48, ¶ 10, 153 P.3d 941, 944 (Wyo. 2007), citing *Smith v. State*, 2005 WY 113, ¶ 37, 119 P.3d 411, 422 (Wyo. 2005). Trial courts are permitted to consider a defendant's character when exercising their discretion to impose sentence. *Doherty*, ¶ 35, 131 P.3d at 974. In evaluating character, the trial court may consider a broad range of reports and information. *Gorseth v. State*, 2006 WY 109, ¶ 15, 141 P.3d 698, 703 (Wyo. 2006). A defendant's cooperation with authorities and remorse for his actions are appropriate factors to be considered when imposing sentence. *Dodge v. State*, 951 P.2d 383, 386 (Wyo. 1997). A sentencing recommendation contained in a PSI is one of the factors that a court may properly consider in determining the appropriate sentence to impose. *Duke v. State*, 2009 WY 74, ¶ 15, 209 P.3d 563, 569 (Wyo. 2009).

*Joreski*, ¶ 13, 288 P.3d at 417 (quoting *Noller*, ¶ 13, 226 P.3d at 871); *see also Manes v. State*, 2004 WY 70, ¶ 9, 92 P.3d 289, 292 (Wyo. 2004) (quoting *Mehring v. State*, 860 P.2d 1101, 1117 (Wyo.1993)) ("Evidence of prior criminal activity is 'highly relevant to the sentencing decision' and may be considered by the sentencing court despite the fact that no prosecution or conviction may have resulted.").

[¶115] In addressing Kovach during the sentencing hearing, the district court commented as follows:

> Okay. Mr. Kovach, I don't know what happened. I read these letters and they portray a Travis Kovach that I did not see in court, that I did not hear about in court and that I did not view in the way of documentary or pictorial evidence in court. It's an inexplicable situation where I'm described about the kind of man that you are, that I see in these letters and that I've heard about from your family and your son's

mother today from what I heard in the way of testimony and evidence during the trial and reviewed in the information that wasn't necessarily part of the trial but led up to the trial, I'm talking more specifically about the incident involving the threat to a neighbor that was the subject of the 404(b) evidentiary motion that I decided last summer. … So it's difficult to reconcile the Travis Kovach that wreaked this brutal and unrelenting attack on the Ribelin brothers on that day and to try and consider you in another way without some explanation that would tell me why there was this progressive escalation of violence and anger and I don't know what other adjectives might be appropriate. But you're here because of that day, you're not here because of saving the life of another person from drowning, you're not here because of all these other things that I've heard and read about you[.]

[¶116] We need not address whether the district court could have appropriately relied on the referenced uncharged misconduct evidence; that is, whether the evidence was sufficiently reliable for the court to consider in its sentencing. *See Hubbard v. State*, 2008 WY 12, ¶ 24, 175 P.3d 625, 630 (Wyo.2008) (sentencing decision must be based upon reliable and accurate information). The above-quoted statement shows that the court disclaimed reliance on information describing Kovach before the incident with the Ribelins and was instead focused on Kovach's conduct on that day. The court reiterated its focus on the incident itself when subsequently during the hearing, the court again referenced the incident and commented on Kovach's failure to seek treatment or counseling to address his behavior during the incident. Based on the record before us, Kovach has not established that the court relied on inaccurate or unreliable uncharged misconduct evidence in sentencing Kovach, and we therefore find no plain error in the court's sentencing.

## B.    Amendment of Judgment to Correct Fine Assessment

[¶117] In his final allegation of error, Kovach asks this Court to review the correction of a clerical error in the district court's final judgment and sentence. Again, the record is clear that the court made a handwritten correction to the total amount of fines assessed against Kovach, increasing that total from $6,000 to $9,000. The question we must address is whether the court's correction of a clerical error violated an unequivocal rule of law in a clear and obvious way. We answer that question in the negative and find no error.

[¶118] The district court imposed fines of $3,000 each on three separate charges on which the jury returned a guilty verdict: $3,000 for each of two counts of aggravated assault and battery, and $3,000 for one count of felonious restraint. The court first announced these

48

fines during the sentencing hearing. The court again imposed each individual fine in its Judgment and Sentence, dated April 2, 2012. The April 2nd order identified each of three individual fines of $3,000, but then added up the assessed fines for a total of $6,000. On April 5, 2012, the court issued an Amended Judgment and Sentence, which contained handwritten notes changing the total of the fines from $6,000 to $9,000.

[¶119] W.R.Cr.P. 36 authorizes a court to correct clerical mistakes in judgments at any time and "after such notice, if any, as the court orders." Nothing changed in the district court's sentence between the time that it announced its sentence during the sentencing hearing and its issuance of the Amended Judgment and Sentence. The record clearly reflects that the court did no more than correct a mathematical error, a clerical adjustment that Rule 36 plainly allows. Kovach has failed to establish a clear and obvious violation of an unequivocal rule of law in the court's amendment of its Judgment and Sentence.

## CONCLUSION

[¶120] We find no violation of Kovach's constitutional rights in the prosecutor's failure to disclose information to the defense or in the district court's discovery orders. We further find no prosecutorial misconduct, and no plain error in the court's sentencing decisions and orders. Affirmed.

49